Lori **PATON**, a minor under 18, suing by her father, Arthur Paton, Plaintiff,

v.

J. Wallace **LA PRADE**, Special Agent in Charge, Federal Bureau of Investigation, Newark, New Jersey, John Patrick Devlin, Peter McDede, Jr., John Hugh Bryan, Agents for the Federal Bureau of Investigation, and Clarence M. Kelley, the Director of the Federal Bureau of Investigation, Postmaster General, United States Postal Service, Defendants.

Civ. A. No. 73–1091.

United States District Court,
D. New Jersey.

Nov. 29, 1978.

Frank Askin, Newark, N. J., for plaintiff.

Carolyn Arch, Asst. U. S. Atty., Dept. of Justice, Newark, N. J., David H. White, U. S. Dept. of Justice, Washington, D. C., for defendants.

## OPINION

WHIPPLE, District Judge.

This matter is before the court on plaintiff's motion for partial summary judgment on the constitutionality of the mail cover pursuant to Fed.R.Civ.P. 56. The issue has been well briefed by both sides and having had the benefit of oral argument, I am prepared to make the following ruling.

Postal Regulation 861.4, 39 C.F.R. § 233.2, authorizing mail covers[1] to "protect the national security" is unconstitutionally vague and overbroad.

## I. FACTUAL BACKGROUND

In February 1973 plaintiff Lori Paton was enrolled in a social studies course,

---

1. The mail cover regulation reads in pertinent part as follows:

> (2) The Chief Postal Inspector, or his designee, may order mail covers under the following circumstances:
>
> (i) When he has reason to believe the subject or subjects of the mail cover are engaged in any activity violative of any postal statute.
>
> (ii) When written request is received from any law enforcement agency wherein the requesting authority stipulates and specifies the reasonable grounds that exist which demonstrate the mail cover is necessary to (A) protect the national security, (B) locate a fugitive, or (C) obtain information regarding the commission or attempted commission of a crime.

However, the holding of this opinion is limited to the "national security" grounds and should not be construed as to invalidate a mail cover for fugitive location or criminal investigation.

"Left to Right" at her local high school. The course attempted to teach the students an overview of the contemporary American political spectrum. As part of an assignment for the course, Paton wrote a letter to the Socialist *Labor* Party requesting information about its program, policies and positions. Inadvertently she addressed the letter to The Socialist *Workers* Party [2] (hereinafter SWP).

Unbeknownst to Paton the Federal Bureau of Investigation (hereinafter FBI) had instituted a mail cover on the SWP headquarters in New York. On January 9, 1973, an internal memorandum to assistant FBI Director, F. E. Miller,[3] recommended a mail cover be placed on the SWP headquarters. This was followed on January 11, 1973 by acting FBI Director L. Patrick Gray's III request to the Assistant Postmaster General for a SWP mail cover.

The "Shackelford Memo" delineates the basis for the FBI's grounds for requesting SWP mail cover. It reads as follows:

*PURPOSE:*

To recommend U. S. Postal Service be requested to institute mail cover on national headquarters of the Socialist Workers Party (SWP), 410 West Street, New York City, for a period of 120 days.

*DETAILS:*

The SWP is the largest of the Communist-Trotskyist splinter groups in United States with a current membership of approximately 1100. Along with its youth arm, the Young Socialist Alliance (YSA) with a membership of approximately 1300, SWP has put forth a continuing propaganda program against the American form of Government coupled with a call to adopt a "socialist" system.

SWP has been able to bring its message to large numbers of American citizens by virtue of its control and domination of the National Peace Action Coalition and the Student Mobilization Com-

mittee to End the War in Vietnam (SMC). These organizations are in the forefront among antiwar groups in the United States. These activities offer the SWP a major role in planning, promoting and executing antiwar demonstrations, some of which have in the past created violence.

The SWP has been cited by the Attorney General pursuant to Executive Order 10450. SWP, of course, advocates the overthrow of the United States Government.

New York has requested that FBI Headquarters request the Postal Inspection Service to institute a mail cover on SWP headquarters for a period of 120 days.

*OBSERVATIONS:*

As noted above, SWP has been able to play a major role in promoting antiwar activities. Some of the best known antiwar activists are or have been SWP members whose influence is felt not only in this country but throughout the world. As an example, . . . SWP member, has just concluded an extensive tour throughout European capitals where he solicited support against current policies of the United States Government.

The New York Office feels that this mail cover will identify new SWP members and sympathizers, establish foreign contacts, develop information concerning financial contributors and greatly assist in determining the identity of employees of the SWP national office.

We currently have ___ mail covers in effect with four requests awaiting approval.

*RECOMMENDATION:*

That the attached letter requesting authorization of a mail cover for 120 days on SWP national headquarters be approved and forwarded to the Assistant Postmaster General.

---

2. It is ironic that this case has its basis in a misaddressed envelope.

3. The January 9, 1973 memorandum is generally referred to as the "Shackelford Memo".

Since counsel for both sides cannot agree on what aspects are pertinent, the whole memorandum was considered by the court.

The mail cover itself is the process by which a record is made of any data appearing on the outside cover of any class of mail matter. 39 C.F.R. § 233.2(c)(1). As a result of the instant mail cover, Paton's name and address were ascertained; this information eventually reaching the Newark FBI office.

An investigation of Paton was begun in Newark. When it was discovered that the Newark FBI files contained no information on Paton an agent was dispatched for a field investigation. The agent, armed with Paton's name and address, contacted the Chester police chief, the Morristown Credit Bureau, and eventually visited Paton's school. There he discovered the reason for the mailing of the initial letter. As a result, the agent drafted a memorandum dated May 7, 1973 which concluded:

> In view of the fact that the subject is a high school student who apparently contacted the National Office of the SWP in New York for information for one of her courses and, due to the fact that she is not believed to be involved in subversive matters, it is recommended that this case be closed administratively.

*Paton v. LaPrade,* 524 F.2d 862, 866 (3d Cir. 1975).

A file was begun on Paton in the Newark office of the FBI. Paton's name appeared in the index file of the Newark FBI with a "100" classification number indicating that her file[4] concerned "subversive" matter. *See* 42 Fed.Reg. 53379, 53380 (1977).

Soon after the field investigation of Paton, the school and the local community learned of the FBI visit. Indeed, news of the investigation of a 16-year old high school student spread throughout the country. *Paton v. LaPrade, supra,* 524 F.2d at 870, nn. 12 & 13 (1975).

Plaintiff Paton instituted this action on July 24, 1973. After considerable litigation and discovery the case is before the court on a limited issue, the constitutionality of the mail cover. Paton seeks partial summary judgment on this issue.

## II. PLAINTIFF'S IVTH AMENDMENT CLAIMS.

Plaintiff generally contends the mail cover violated her right to be free from unreasonable seizure of, or intrusion into, her personal papers and effects. U. S. Constitution, Amendment IV.

■ It is well settled that the Fourth Amendment's protections extend to items in the mail. Letters and packages may only be opened and examined pursuant to a proper warrant, as if the items were to be searched in one's own household. *Ex parte Jackson,* 96 U.S. 727, 733, 24 L.Ed. 877 (1877).[5]

■ Such is not the situation in the case at bar. The record clearly demonstrates[6] that Paton's letter was not opened; that merely her name and address were copied from the outside of the envelope. The question is whether this constituted a search or seizure within the meaning of the Fourth Amendment.

In the 1967 case *Katz v. U. S.,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, the Supreme Court dispensed with the notion that the Fourth Amendment protected certain "physical areas". In *Katz* the court held that the government could not introduce evidence of the contents of a telephone conversation which had been heard by bugging a public telephone booth. "For the Fourth Amendment protects people, not places." *Id.* at 351, 88 S.Ct. at 511.

Thus the focus was removed from the location of the search and placed upon the individuals' "reasonable expectation of pri-

---

4. The file has been destroyed by stipulation of counsel.

5. *See also, U. S. v. Ramsey,* 431 U.S. 607, 97 S.Ct. 1972, 1982, 52 L.Ed.2d 617 (1977); *Procunier v. Martinez,* 416 U.S. 396, 408 09, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Birnbaum v. U. S.,* 436 F.Supp. 967, 983 984 (E.D.N.Y.1977).

6. The February 1, 1976 deposition of Alfred Mahone (the postal worker assigned to the SWP mail cover) reflects that no mail was opened.

vacy." *Id.* at 360, 88 S.Ct. 507. "What a person knowingly exposes to the public . . . is not a subject of [the] Fourth Amendment." *Id.* at 351, 88 S.Ct. at 511.

Assuming that a search was involved in the copying of Paton's return address,[7] this court must consider her expectation of privacy in the return address information. As a matter of common sense, Paton's return address was visible to any number of postal workers. As a matter of law mail covers have been consistently declared legal in light of Fourth Amendment challenges both before[8] and after[9] *Katz v. U. S., supra,* culminating in the recent case of *U. S. v. Choate,* 576 F.2d 165 (9th Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 350, 58 L.Ed.2d 344 (1978).[10]

Plaintiff Paton attempts to distinguish the cases upholding mail covers on the grounds that they deal with investigations of criminal activity rather than the national security investigation of the instant case. Although a pertinent distinction, it is not relevant on the Fourth Amendment issue. The weight of authority compels finding for the defendants on this issue.

### III. PLAINTIFF'S FIRST AMENDMENT CLAIMS.

"Congress shall make no law . . . abridging the freedom of speech . . ." U. S. Constitution, Amendment I.

■ Without doubt communication through the mails implicates the First Amendment. "The United States may give up the postoffice when it sees fit, but while it carries it on the use of the mails is almost as much a part of free speech as the right to use our tongues . . . ." *Milwaukee Publishing Co. v. Burleson,* 255 U.S. 407, 437, 41 S.Ct. 352, 363, 65 L.Ed. 704 (1921) (Holmes, J. dissenting).[11]

■ Paton's letter was a request for information regarding a political party.

Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes.

*Mills v. Alabama,* 384 U.S. 214, 218–219, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966). There is, of course, a profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open. *New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Buckley v. Valeo,* 424 U.S. 1, 14, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Freedom of speech includes not only the right to utter or to print, but also the right to receive.[12] *See, Griswold v.*

---

**7.** The transcription of Paton's return address might qualify under the plain view exception to the warrant requirement. *See, U. S. v. Solis,* 536 F.2d 880, 881 (9th Cir. 1976) and cases cited therein.

**8.** *See, Canaday v. U. S.,* 354 F.2d 849, 856 (8th Cir. 1966); *Lustiger v. U. S.,* 386 F.2d 132, 139 (9th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1042, 19 L.Ed.2d 1142.

**9.** *See, U. S. v. Bianco,* 534 F.2d 501, 507–508 (2d Cir. 1976); *U. S. v. Leonard,* 524 F.2d 1076, 1086–1087 (2d Cir. 1975); *U. S. v. Isaacs,* 347 F.Supp. 743, 749–750 (N.D.Ill.1972).

**10.** The decision in *Choate* was that of a divided court with a particularly strong dissent by Judge Hufstedler. It has come to my attention that the petition for certiorari to the United States Supreme Court in *Choate* was denied

without an opinion. Counsel for the government has been kind enough to supply me with the briefs submitted to the court in *Choate's* petition for certiorari. Nowhere in either *Choate's* or the United States' brief is there a discussion of national security as a ground for the mail cover. That issue simply was not before the Supreme Court.

**11.** The court has now adopted what was originally a dissent. *See, Blount v. Rizzi,* 400 U.S. 410, 416, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971); *Roth v. U. S.,* 354 U.S. 476, 504 n.5, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

**12.** Indeed the Supreme Court has held that the public has the right to receive information amounting to mere commercial speech, *e. g.,* prescription drug prices and lawyers fees. *Bates v. State Bar of Arizona,* 433 U.S. 350, 363–364, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977).

*Connecticut,* 381 U.S. 479, 482, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *U. S. v. Lambert,* 446 F.Supp. 890, 898 (D.Conn.1978) and cases cited therein.

■ It is now well settled that any government inquiry into the identities of members, adherents or persons who have an interest in a particular political organization conflicts with established First Amendment rights. *Gibson v. Florida Legislative Investigation Committee,* 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963). As the court stated in *N. A. A. C. P. v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), the problem with this type of inquiry is that it:

> . . . may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure.

357 U.S. at 463, 78 S.Ct. at 1172. Thus, as a matter of law, Paton had a right to receive her requested information free of government interference and to remain anonymous in her request for political information.

■ It may well be that the mail cover was a relatively unobtrusive interference with plaintiff's First Amendment rights. It may also be that Paton has not been deterred from further political inquiry. Nevertheless, the *Gibson* and *NAACP* line of cases make it clear that governmental inquiry alone trenches upon First Amendment rights. Moreover the Third Circuit has held that Paton has the requisite standing to challenge the constitutionality of the mail cover regulation. *Paton v. LaPrade,* 524 F.2d 862, 873 (3d Cir. 1975). First Amendment freedoms "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Bates v. Little Rock,* 361 U.S. 516, 523, 80 S.Ct. 412, 416, 4 L.Ed.2d 480 (1960). There can be no doubt that governmental investigation of a legitimate political group can have a chilling effect both on members of the group and on members of the public who wish to learn about the group. *NAACP v. Alabama, supra.*

■ Defendant advances the theory that since the mail cover did not intrude on the content of the speech, rather it merely noted the existence of the communication, it does not infringe upon First Amendment rights.[13] This would be akin to holding that political organizations must disclose the identity of all those who communicate with them, yet need not disclose the nature of the communication. This is simply contrary to the spirit and holding of *NAACP v. Alabama, supra,* and its progeny.

■ When First Amendment considerations are involved the normal presumption in favor of the constitutional validity of legislation is abrogated.[14] Encroachment of First Amendment rights cannot be justified upon a mere showing of a legitimate state interest. *Kusper v. Pontikes,* 414 U.S. 51, 58, 94 S.Ct. 303, 38 L.Ed.2d 260 (1974); *Elrod v. Burns,* 427 U.S. 347, 362, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). The interest advanced must be of paramount importance; indeed, the burden is on the government to demonstrate such an interest. *Buckley v. Valeo,* 424 U.S. 1, 94, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Thus, it is firmly established that a significant impairment of First Amendment rights must survive strict or exacting scrutiny. *Elrod v. Burns, supra,* 427 U.S. at 362, 96 S.Ct. 2673; *NAACP v. Alabama, supra,* 357 U.S. at 460–461, 78 S.Ct. 1163.

This type of scrutiny is necessary even *if any deterrent effect* on the exercise of First Amendment rights arises, not through direct government action, *but indirectly as an unintended but inevitable result of the government's* conduct . . . ."

13. *Citing, U. S. v. Van Leeuwen,* 397 U.S. 249, 251 252, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970) for this distinction.

14. *See, e. g., U. S. v. Carolene Products Co.,* 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938).

*Buckley v. Valeo, supra,* 424 U.S. at 65, 96 S.Ct. at 656. (Emphasis supplied) It is clear the mail cover regulation must survive strict scrutiny in order to be upheld.

Paton puts forth two theories to demonstrate that the regulation does not meet strict scrutiny. Plaintiff alleges the regulation is void for vagueness [15] in that the "national security" provision is not defined with sufficient clarity. The vagueness doctrine is employed by the courts to insure that officials are not vested with a potentially abusive degree of discretion in enforcing the law. *See, Smith v. Goguen,* 415 U.S. 566, 575, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). It is further alleged that the national security provision is overbroad [16] in that it proscribes protected as well as unprotected First Amendment activity. *See, U. S. v. Robel,* 389 U.S. 258, 266, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967).

In many cases the doctrines of overbreadth and vagueness are distinguishable; however, in a suit challenging an ambiguously worded statute for infringing upon First Amendment rights, the doctrines blend. The same evils are addressed, *i. e.,* application of the statute's sanctions to protected activity and deterrence of others from engaging in similar conduct, and the same remedies are available, *i. e.,* a narrowing interpretation or facial invalidation. Thus, courts often do not distinguish between the two doctrines. *U. S. v. Lambert,* 446 F.Supp. 890, 897 (D.Conn.1978).

Regardless of whether vagueness and overbreadth are considered independently or in a merged fashion, the threshold question is whether the regulation is susceptible to impermissible applications. As a result the regulation must first be considered "on its face" before proceeding to "as applied" analysis.

## IV. THE MAIL COVER REGULATION.

### A. Material Facts

■ Counsel for both the plaintiff and the defendants submitted separate statements of material fact. Indeed much of government's argument during the hearing for this instant motion dwelled on the disparities between plaintiff and defendants' characterizations of the facts.

Although it is widely accepted that the summary judgment procedure pursuant to F.R.Civ.P. 56 is a device for promptly disposing of actions in which there is no genuine issue as to any material fact [17] it does not follow that summary judgment is not proper simply because of a dispute as to the facts. Paton's motion for partial summary judgment on the constitutionality of the mail cover is initially a question of law. "Any questions of law existing after an answer is filed may, despite issues of fact, be raised in proper motions under F.R. Civ.P. 12 or 56, and be resolved before trial . . . ." *Mellon Nat'l Bank and Trust Co. v. Nationwide Mutual Insurance Co.,* 32 F.R.D. 365, 366 (W.D.Pa.1962).

### B. The Regulation Analyzed On Its Face.

As discussed above (n. 1 *supra*) a mail cover is a procedure whereby the postal service sets aside all mail sent to a particular addressee and records all the information which appears on its outside cover. Postal regulations first authorized the use of mail covers in 1879, only one year after *Ex parte Jackson, supra,* was decided. *U. S. v. Choate,* 576 F.2d 165, 177 (9th Cir. 1978). More rigid and restricted regulations were issued in 1965 [18] covering virtual-

---

15. *See generally,* Note, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U.Pa.L. Rev. 67 (1960).

16. *See generally,* Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844 (1970).

17. 6 Moore's Federal Practice ʿ 56.04[1].

18. The changes were the result of congressional hearings; indeed the mail cover has been the subject of several congressional hearings. *See, The Matter of Wiretapping, Electronic Eavesdropping, and other Surveillance:* Hearings before the Subcomm. on Courts, Civil Liberties and the Administration of Justice of the House Comm. on the Judiciary, 94th Cong. 1st Sess., Ser. No. 26, Part 1 at 326, 352–54 (1975). For a detailed history of mail cover regulations *see Postal Inspection Service's Monitoring and Control of Mail Surveillance and Cover Programs:* Hearings before the Subcomm. on Post-

ly all objections that had been previously raised to the mail cover procedure. *U. S. v. Choate, supra,* 576 F.2d at 178. It is those regulations which, but for minor changes, existed at the time of the Paton Investigation and which exist now.[19]

There are three grounds for instituting a mail cover in order to obtain information: (1) protecting the national security (2) locating a· fugitive, or (3) obtaining evidence of commission or attempted commission of a crime. 39 C.F.R. § 233.2(c)(1). It is interesting to note that the regulation defines both fugitive [20] and crime [21] but that a definition of national security is conspicuous in its absence. Indeed, the Inspector General of the Post Office has testified that as to national security mail covers there are no standards whatsoever and that the Postal Service would welcome congressional "guidance" in that regard. *U. S. v. Choate, supra,* 576 F.2d at 188 n. 18.

There is no dispute that the mail cover on the SWP headquarters was based on national security grounds.[22] Unfortunately, the definition of national security is not entirely clear. In *U. S. v. Choate, supra,* the court upheld the mail cover in a criminal investigation context, yet cited the case at bar as an example of a potential mail cover abuse in the nebulous area of national security. 576 F.2d at 180.

The Supreme Court has specifically commented on the concept of national or domestic security. In *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) the court in a per curiam decision held that the government could not restrain the publication of the "Pentagon Papers" by The New York Times and the Washington Post. While it is true that *New York Times Co., supra,* relates to the disfavored practice of prior restraints on the press; nevertheless consider Justice Black's concurrence:

. . . we are asked to hold that despite the First Amendment's emphatic command, the Executive Branch, the Congress, and the Judiciary can make laws enjoining publication of current news and abridging freedom of the press in the name of "national security." The Government does not even attempt to rely on any act of Congress. Instead it makes the bold and dangerously far-reaching contention that the courts should take it upon themselves to "make" a law abridging freedom of the press in the name of equity, presidential power and national security, even when the representatives of the people in Congress have adhered to the command of the First Amendment and refused to make such a law.

*New York Times Co. v. United States, supra,* 403 U.S. at 718, 91 S.Ct. at 2143, 2144.

al Facilities, Mail and Labor Management of the House Comm. on Post Office and Civil Service, 94th Cong., 1st Sess., Ser. No. 94–39 (1975); *Invasions of Privacy (Government Agencies)*: Hearings before the Subcomm. on Admin. Practice and Procedure of the Senate Comm. on the Judiciary, 89th Cong., 1st Sess. at 67 69 (1965).

**19.** 39 C.F.R. § 233.2(c)(1) was promulgated on March 12, 1975, but is essentially the same as the regulation in effect in February 1973. *U. S. v. Choate, supra,* 576 F.2d at 186 n. 10.

**20.** 39 C.F.R. § 233.2(c)(2), reads:

"Fugitive" is any person who has fled from the United States or any State, territory, the District of Columbia, or possession of the United States, to avoid prosecution for a crime, to avoid punishment for a crime or to avoid giving testimony in a criminal proceeding.

**21.** 39 C.F.R. § 233.2(c)(3), reads:

"Crime", for purposes of these regulations, is any commission of an act or the attempted commission of an act that is punishable by law by imprisonment for a term exceeding 1 year.

**22.** A letter dated January 11, 1973 from L. Patrick Gray to the Assistant Postmaster General, Inspection Service stated in part that:

"[C]overage is desired on all first class mail received [at] the above address. It is believed this coverage will provide valuable information to this Bureau in connection with our internal security responsibilities.

There is no indictment pending against the Socialist Workers Party or members of this organization in New York nor is there anyone known to be residing at the above address who is under indictment."

Similarly, there is no statutory authority for the mail cover procedure.[23] "The word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment." *New York Times Co. v. United States, supra,* 403 U.S. at 719, 91 S.Ct. at 2144.

In *United States v. United States District Court,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) the court held that prior judicial approval was required for a wiretap in a domestic security situation. In discussing national security, Justice Powell commented:

> National security cases, moreover, often reflect a convergence of First and Fourth Amendment values not present in cases of "ordinary" crime. Though the investigative duty of the executive may be stronger in such cases, so also is there greater jeopardy to constitutionally protected speech.
>
> .    .    .    .    .
>
> History abundantly documents the tendency of Government—however benevolent and benign its motives—to view with suspicion those who most fervently dispute its policies. Fourth Amendment protections become the more necessary when the targets of official surveillance may be those suspected of unorthodoxy in their political beliefs. The danger to political dissent is acute where the Government attempts to act under so vague a concept as the power to protect "domestic security."

407 U.S. at 313–314, 92 S.Ct. at 2135. Thus the court dispels the myth that national security is an incantation with which the government can circumvent the Constitution or the laws of the land.

The Government places considerable emphasis on the recent case of *Reporters Committee for Freedom of the Press v. Ameri-*

can Telephone and Telegraph Co., 192 U.S. App.D.C. 376, 593 F.2d 1030, hereinafter referred to as Reporters Committee. There the plaintiffs, newspaper publishers, individual journalists, and the Reporters Committee for Freedom of the Press sued ATT for declaratory and injunctive relief alleging that defendants' policy of releasing toll-call records and information violated their First and Fourth Amendment rights. Supra, p. 384, p. 1038 of 593 F.2d. The toll records of the journalists were subpoenaed in connection with a felony investigation. Supra, p. 385, p. 1039 of 593 F.2d.

Such reliance on *Reporters Committee* is misplaced as it is distinguishable from the case at bar. Time after time Judge Wilkey[24] repeats that:

> The First Amendment does not guarantee plaintiff "journalists," or other citizens, a special right to immunize themselves from good faith investigation simply because they may be engaged in gathering information.

Supra, p. 397, p. 1051 of 593 F.2d. Similarly pp. 397, 399, pp. 1051, 1053 of 593 F.2d. Emphasis in original. Yet in *Reporters Committee* the toll records were obtained pursuant to a valid *subpoena* as the result of a *criminal* investigation; neither of these attributes are present in the case at bar.[25]

It is interesting to note that Judge Wilkey considers mail covers as analogous to the *Reporters Committee* situation. At pp. 402–403 at pp. 1056–1057 of 593 F.2d, he comments that courts have routinely upheld the mail cover procedure against both Fourth and First Amendment attacks. While this is true, no court has ever considered a mail cover based on national/domestic security grounds and thus the instant case is distinguishable. Indeed if the mail cover of the SWP had been based on a

---

**23.** *See, U. S. v. Choate, supra,* 576 F.2d at 189 n. 20.

**24.** The decision in *Reporters Committee* was that of a divided court. Judge Wilkey wrote the majority opinion, Judge Robinson a concurrence and Chief Judge Wright a dissent.

**25.** I find it unnecessary to analyze whether the mail cover of the SWP was instituted in good faith.

*good faith criminal investigation,* it most certainly would be valid.

## V. Conclusion.

■ And so the emphasis returns to the phrase "national security". It should be understood that my ruling today in no way affects mail covers based on criminal or fugitive investigations as authorized by 39 C.F.R. § 233.2(2)(ii)(B) & (C).

Having considered the regulation in its entirety I do not believe it is susceptible to a narrowing construction. *See, Erznoznik v. City of Jacksonville,* 422 U.S. 205, 216, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975). National security is too ambiguous and broad a term. The memory of the lawlessness that masqueraded as "national security" searches is too close to the memory of this court. *See, U. S. v. Ehrlichman,* 178 U.S.App.D.C. 144, 159, 546 F.2d 910, 925 (1976); *Zweibon v. Mitchell,* 170 U.S.App.D.C. 1, 516 F.2d 594 (1975). While it is commendable that the FBI has altered and considerably tightened their guidelines for mail covers, that investigative technique is still open to many other agencies who may not have restricted their mail cover requests. As a result, I find a narrow construction of the regulation an inadequate remedy.

I am not unmindful of the fact that invalidating a regulation "on its face" is strong medicine. *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Nevertheless, it is the only cure. National security as a basis for the mail cover is unconstitutionally vague and overbroad. Without any qualification or explanation of what is meant by national security an investigation can be initiated on the assertions of an overzealous public official who disagrees with the unorthodox, yet constitutionally protected political views of a group or person. It allows officials to pursue their personal predilections. *Smith v. Gouguen,* 415 U.S. 566, 575, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

"It has become axiomatic that '[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms.'" *U. S. v. Robel,* 389 U.S. 258, 265, 88 S.Ct. 419, 424, 19 L.Ed.2d 508 (1968), *citing, NAACP v. Button,* 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Such precision is lacking in the mail cover regulation.

An Order in conformity with this opinion is to be submitted within seven (7) days.