**CITY OF JERSEY CITY, et al., Plaintiffs,**

**v.**

**Samuel R. PIERCE, et al., Defendants.**

**Civ. A. No. 85–455.**

United States District Court,
D. New Jersey.

June 9, 1987.

---

Joanne Monahan, Asst. Corporate Counsel, Jersey City Law Dept., Jersey City, N.J., for plaintiffs.

Vincent E. Gentile, Asst. U.S. Atty., Chief, Civil Div., Newark, N.J., for defendants.

## OPINION AND ORDER

LECHNER, District Judge.

Pursuant to a program established by Congress, the Department of Housing and Urban Development ("HUD") provides federal grants to qualified urban areas so as to stimulate economic development activity in those areas. One of the conditions on the availability of these federal grants is that the development projects so funded not be used to facilitate a relocation of industrial or commercial plants or facilities from one urban area to the funded urban area. In January, 1985, HUD issued a "Statement of Policy" establishing certain presumptions with respect this "anti-pirating" condition on the availability of federal funds. Shortly thereafter, a number of New Jersey cities and urban areas filed this action challenging HUD's Statement of Policy.

Judge Lacey denied plaintiffs' application for injunctive and declaratory relief in April, 1985. The Third Circuit affirmed that decision in February, 1986. Now before the Court are defendants' motion for dismissal of the action or summary judgment, and plaintiffs' motion for summary judgment. For the reasons set forth below, defendants' motion for summary judgment will be granted.

*Facts*

The plaintiffs in this action originally comprised twelve municipalities or political subdivisions of the State of New Jersey. All but two of the original plaintiffs, Jersey City and the Town of Kearny, have withdrawn from the action. The remaining plaintiffs are referred to herein, except as otherwise indicated, as Jersey City. The

defendants in the action are Samuel R. Pierce, Secretary of HUD and HUD itself. Except as otherwise indicated, the defendants are referred to as HUD.

In 1977, Congress amended the Housing and Community Development Act of 1974, 42 U.S.C.A. § 5301 *et seq.*, to create an "urban development action grant" ("UDAG") program. The UDAG program authorizes the Secretary of HUD "to make urban development action grants to cities and urban counties which are experiencing severe economic distress to help stimulate economic development activity needed to aid in economic recovery." 42 U.S.C.A. § 5318(a). The UDAG program is designed to be available "to cities and urban counties which have, in the determination of the Secretary, demonstrated results in providing housing for low- and moderate-income persons and in providing equal opportunity in housing and employment for low- and moderate-income persons and members of minority groups." 42 U.S.C.A. § 5318(b)(1) (West Supp.1987).

Under the statute, the Secretary is empowered to establish criteria to use in determining which, among competing grant applicants, should be awarded UDAG funds. The Secretary has established such criteria, which are set forth in 24 C.F.R. § 570.452, *et seq.* Principal among these criteria is the degree of economic distress being experienced by an applicant city or urban county. The statute also imposes limitations on grants for projects which involve industrial relocations:

> No assistance may be provided under this section for projects intended to facilitate the relocation of industrial or commercial plants or facilities from one area to another, unless the Secretary finds that the relocation does not significantly and adversely affect the unemployment or economic base of the area from which the industrial or commercial plant or facility is to be relocated.

42 U.S.C.A. § 5318(h) (the "anti-pirating provision"). The terms of the anti-pirating provision, as well as its legislative history, make clear Congress was concerned that UDAG-inspired economic recovery in one area not occur at the expense of similarly distressed urban areas. *See* H.R.Rep. No. 95–236, 95th Cong., 1st Sess. 9, *reprinted in* 1977 U.S.Cong.Code & Admin.News 2884, 2892.

Every UDAG application must contain a description of the applicant's proposed development projects, including a description of those businesses or entities that are expected to relocate to the project. 24 C.F.R. § 570.458. It appears that oftentimes, however, UDAG applicants submit applications for which not all of the proposed development space has an identified anticipated user. The parties refer to such uncommitted space as "speculative space." The problem which ultimately underlies this case is how the Secretary of HUD is to uphold his statutory mandate of not awarding UDAG funds to projects intended to facilitate relocation from other distressed areas, when some portion of a proposed UDAG project involves speculative space.

HUD claims that in the UDAG funding rounds preceding and including the January, 1985 funding round, applicants submitted an increasing number of UDAG applications for development of projects containing speculative space. (Finkle Decl., 2/6/85, ¶ 8.) HUD further claims that in at least two recently proposed UDAG development projects containing speculative space, HUD discovered that the projects' developers had been marketing their projects' speculative spaces to potential relocatees from nearby distressed urban areas. (*Id.*, ¶¶ 11–14.) The particular problems facing HUD in such situations are explained by a HUD official:

> Because UDAG applications are submitted by municipal jurisdictions, and not by developers, HUD is frequently unaware of the developer's marketing efforts, if at all, until after approval of the project. Further, because of the absence of identification of an intended occupant of the facility when completed, it is not self-evident when an application containing speculative space is considered for preliminary approval that the project is intended to facilitate a relocation.

(*Id.*, ¶ 14.)

In light of the increasing number of UDAG applications submitted for projects

containing speculative space and because of evidence that some such projects were being marketed to potential relocatees from nearby distressed areas, on January 9, 1985 HUD issued a "policy statement," entitled "Statement of Policy—Anti-Pirating Prohibitions, UDAG Program." 50 Fed.Reg. 1505 (1985) (the "Policy Statement"). Effective upon issuance, the Policy Statement asserts at the outset:

Mobility is an important element of a dynamic economic system. The Department believes, however, [the anti-pirating provision] represents a strong Congressional sentiment that discretionary Federal grants should not be a decisive factor in the competition between geographic areas to relocate business investment from one area to another. Accordingly, the Department has concluded that it must formulate guidelines for its administration of the anti-pirating provisions in the context of speculative projects, and that it should publish such guidelines for the guidance of potential UDAG applicants.

(*Id.* at 1505–06.)

Having set forth the considerations giving rise to the Policy Statement, HUD established the following policy:

1. For purposes of administering the requirements of 24 CFR § 570.456(c), HUD will presume that (a) a proposed project which includes speculative commercial or industrial space (other than space excluded pursuant to paragraph 5 below) is intended to facilitate the relocation of a facility from one area to another, and (b) such relocation will significantly and adversely affect the level of unemployment and the economic base of the area from which the facility is presumed to be relocated, if it is demonstrated to HUD's satisfaction that:

(i) The proposed project is reasonably proximate (i.e., within 50 miles) to an area from which there has been a significant current pattern of movement to areas reasonably proximate thereto of jobs of the category for which such space is appropriate;

(ii) There is a likelihood of continuation of such a pattern, based on measurable comparisons between the area from which such movement has been occurring and the area of the proposed project in terms of tax rates, energy costs, and similar relevant factors; and

(iii) The area from which such movement of jobs has been occurring is a distressed community as defined in 24 CFR 570.452.

(*Id.* at 1506.) The Policy Statement further indicates these presumptions are rebuttable, but the burden of overcoming them is on the UDAG applicant. In addition, the Policy Statement gives some guidance as to how the presumptions may and may not be effectively rebutted. (*Id.* at 1506–07.)

On January 28, 1985, the original plaintiffs initiated this action challenging the Policy Statement (1) as violative of the Administrative Procedure Act, 5 U.S.C.A. § 553 ("APA") and (2) as an arbitrary and capricious agency action. Plaintiffs sought an injunction enjoining HUD from implementing the Policy Statement and a declaration declaring the Policy Statement void and invalid. HUD opposed the action and filed a cross-motion for dismissal of the complaint or for summary judgment. After a hearing conducted on March 22, 1985, Judge Lacey issued an opinion and order on April 23, 1985 denying plaintiffs' application for injunctive and declaratory relief and HUD's motion for dismissal or summary judgment. Judge Lacey specifically found: (1) plaintiffs had failed to establish a likelihood of success on the merits of their claims that HUD violated the APA and that the Policy Statement was arbitrary and capricious, and (2) "[t]he record of this case being incomplete at this time, [HUD's] motion for summary judgment is denied without prejudice." (Lacey Opinion at p. 22.)

Plaintiffs appealed the denial of their application and, in an opinion filed in this Court on February 7, 1986, the Third Circuit affirmed the denial. The Circuit specifically found "the district court did not abuse its discretion in denying the motion for a preliminary injunction." (Circuit

Opinion at p. 2.) However, the Circuit remanded the case, stating: "[W]e believe the contention that the statement of policy comes under the APA is a plausible one, and deserves careful consideration when the district court proceeds to the merits of the controversy." (*Id.* at p. 3.)

Since February, 1986, the record as it was initially presented to this Court has changed in no significant respect. As noted previously, most of the original plaintiffs have withdrawn from the action. The only additional submissions on the record are a supplemental declaration supporting HUD's motion for dismissal or summary judgment and an affidavit supporting Jersey City's motion for summary judgment. HUD's supplemental declaration indicates only that no pending UDAG applications have been submitted by the plaintiffs since the filing of this action. (Buchet Decl., 4/1/87.) Jersey City's affidavit confirms that Jersey City has submitted no UDAG applications since the filing of this action and suggests Jersey City has submitted no applications because of the "chilling effect" of the Policy Statement. (Cohen Aff., 4/6/87.) As conceded in Jersey City's brief in support of its motion, it seeks summary judgment "[b]ased upon arguments previously made and the Third Circuit Court's opinion that the city's argument is plausible and deserves careful consideration." (Jersey City Brief, 4/7/87 at p. 14.)

Because the record, including Jersey City's additional submission, fails to indicate the denial of plaintiffs' initial application should be disturbed, HUD's motion for summary judgment will be granted.

### Discussion

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The district court's task in deciding the motion is to determine whether "there are any genuine factual issues that properly can be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). All evidence submitted must be

viewed in a light most favorable to the party opposing the motion. *See Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). In cases such as the one now before the Court, in which the facts are relatively undisputed and disposition turns largely on a legal analysis, summary judgment is an appropriate mechanism for deciding the case. *See Paton v. LaPrade,* 469 F.Supp. 773, 779 (D.N.J.1978).

### 1. *Violation of the APA*

The APA defines a rule as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency...." 5 U.S.C.A. § 551(4). The APA futher establishes certain procedures which must be followed by an agency engaged in "rule making." These procedures call for publication of "[g]eneral notice of proposed rule making" and require that the agency "give interested persons an opportunity to participate in the rule making." 5 U.S.C.A. § 553. Jersey City argues the Policy Statement, despite its title, is actually a rule as defined by the APA. Because the Policy Statement was effectuated without prior notice or opportunity to comment, Jersey City charges the Policy Statement is null and void and must be held invalid.

However, the APA specifically excludes from these notice and hearing requirements, "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice...." 5 U.S.C.A. § 553(b)(A). HUD asserts the Policy Statement is simply a policy guideline and thus is not subject to the APA's rule making procedures. In denying Jersey City's application for injunctive and declaratory relief, Judge Lacey agreed with HUD, stating: "On the record before the court, I am not persuaded that this statement of policy is other than what it purports to be. It is merely a guideline to the public to advise how the agency will be

exercising its discretion under § 5318." (Lacey Opinion at p. 15.)

■ Whether an agency action constitutes a "rule" or a "policy statement" must be determined not by reference to the label given the action by the agency, but rather by the substance of the action itself and its practical effects on affected parties. As stated by the Supreme Court, "[t]he particular label placed upon [an agency action] by the [agency] is not necessarily conclusive, for it is the substance of what the [agency] has purported to do and has done which is decisive." *Columbia Broadcasting System, Inc. v. United States,* 316 U.S. 407, 416, 62 S.Ct. 1194, 1200, 86 L.Ed. 1563 (1942). *See also Cerro Metal Products v. Marshall,* 620 F.2d 964, 981 (3d Cir.1980) ("the function of the court is to decide what a rule 'really' does and then require a rule substantially affecting a legal right to be promulgated by notice-and-comment rulemaking or else be held invalid").

One court has enunciated the distinction between a rule and a general statement of policy as follows:

The critical distinction between a substantive rule and a general statement of policy is the different practical effect that these two types of pronouncements have in subsequent administrative proceedings.... A properly adopted substantive rule establishes a standard of conduct which has the force of law. In subsequent administrative proceedings involving a substantive rule, the issues are whether the adjudicated facts conform to the rule and whether the rule should be waived or applied in that particular instance. The underlying policy embodied in the rule is not generally subject to challenge before the agency.

A general statement of policy, on the other hand, does not establish a "binding norm." It is not finally determinative of the issues or rights to which it is addressed. The agency cannot apply or rely upon a general statement of policy as law because a general statement of policy only announces what the agency seeks to establish as policy. A policy statement announces the agency's tentative intentions for the future.

*Pacific Gas & Elec. Co. v. Federal Power Comm'n,* 506 F.2d 33, 38 (D.C.Cir.1974) (citations and footnote omitted).

■ A number of courts have assessed whether a challenged agency action constitutes a "binding norm," by focusing on the degree to which the action prospectively constricts the agency's administrative discretion. *See, e.g., Mada-Luna v. Fitzpatrick,* 813 F.2d 1006, 1014 (9th Cir.1987) (whether action constitutes a rule depends on "extent that the directive 'narrowly limits administrative discretion' or establishes a 'binding norm' "); *Ryder Truck Lines, Inc. v. United States,* 716 F.2d 1369, 1377 (11th Cir.1983) (key inquiry "is the extent to which the challenged policy leaves the agency free to exercise its discretion to follow or not follow that general policy in an individual case"), *cert. denied,* 466 U.S. 927, 104 S.Ct. 1707, 80 L.Ed.2d 181 (1984); *American Trucking Ass'ns, Inc. v. Interstate Commerce Comm'n,* 659 F.2d 452, 463 (5th Cir.1981); *Batterton v. Marshall,* 648 F.2d 694, 706–07 (D.C.Cir.1980); *American Bus Ass'n v. United States,* 627 F.2d 525, 529 (D.C.Cir.1980) (one issue "is whether a purported policy statement genuinely leaves the agency and its decisionmakers free to exercise discretion"). Simply put, agency actions which do not afford those individuals charged with carrying out agency responsibilities flexibility to handle agency matters on a case-by-case basis, may properly be viewed as substantive rules subject to invalidation for noncompliance with the requirements of the APA.

■ Having reviewed the Policy Statement and the record before me in light of this standard, I find the Policy Statement does not establish binding norms unduly restricting HUD's flexibility in reviewing UDAG applications. The Policy Statement creates a presumption that a proposed UDAG development project, meeting certain conditions, "is intended to facilitate the relocation of a facility from one area to another." Unquestionably, the Policy Statement impacts on UDAG applicants whose proposed projects meet the criteria

giving rise to the Policy Statement's presumption. However, virtually any agency action will inevitably have *some* impact on interested parties. Whether that impact is substantial enough to trigger the APA's notice and comment requirements depends in large measure on the extent to which subsequent agency discretion is curtailed by the action.

In the case at bar, the Policy Statement creates a rebuttable presumption. Although a UDAG applicant's proposed development project may trigger the presumption that the project is intended to facilitate a relocation, the applicant may overcome this presumption by demonstrating, to HUD's satisfaction, the proposed project is not likely to facilitate relocation from a distressed community. The determination about whether a project is intended to facilitate relocation, therefore, rests in the discretion of HUD officials reviewing UDAG applications, just as it did prior to enactment of the Policy Statement. Indeed, that HUD's discretion in the awarding of UDAG applications remains viable, even under the terms of the challenged Policy Statement, is demonstrated by evidence on the record that at least one New Jersey UDAG applicant has overcome the Policy Statement's presumption so as to obtain UDAG funds. (Finkle Decl., 2/6/85, ¶¶ 22–24.)

Courts in analogous situations have ruled that agency actions which establish presumptions for use in exercising administrative duties are not substantive rules subject to the APA's notice and comment requirements. In *Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369 (11th Cir. 1983), the Eleventh Circuit reviewed an action undertaken by the Interstate Commerce Commission ("ICC"), to determine whether the action amounted to a general statement of policy or a substantive APA rule. The ICC had changed a longstanding presumption used "in determining whether a particular leasing arrangement constitutes private or for-hire carriage," *Id.* at 1375, to create a rebuttable presumption arising when certain enumerated criteria were found to exist. In recognizing the ICC's action as a general statement of policy rather than a rule, the Eleventh Circuit

stated: "The use of such presumptions generally serves to direct the analysis but not necessarily the answer. Therefore, the use of presumptions does not reasonably transform a statement of policy into a binding norm." *Id.* at 1377. *See also Regular Common Carrier Conf. of the American Trucking Ass'ns, Inc. v. United States*, 628 F.2d 248, 251 (D.C.Cir.1980) (general statement of policy establishing presumptions not a rule).

Accordingly, I find the Policy Statement is "what it purports to be" and should not be invalidated for noncompliance with the notice and comment provisions of the APA.

### 2. *Arbitrary Agency Action*

As a general statement of policy, HUD's Policy Statement is subject to judicial review for a determination as to whether the policy is arbitrary, capricious, an abuse of discretion or otherwise contrary to law or in excess of HUD's statutory authority. *See* 5 U.S.C.A. § 706(2); *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 44–45, 103 S.Ct. 2856, 2867–68, 77 L.Ed.2d 443 (1983); *Ryder Truck Lines, Inc.*, 716 F.2d at 1378; *Consolidated Rail Corp. v. United States*, 619 F.2d 988, 993 (3d Cir.1980). As I view the Policy Statement and the record before me, the Policy Statement is not arbitrary, capricious or otherwise contrary to law; rather, it represents a reasonable effort on the part of HUD to effectuate the Congressional anti-pirating provision when reviewing proposed UDAG projects expected to contain some amount of speculative space.

As an initial matter, agencies are clearly vested with authority to create certain evidentiary presumptions. *See National Labor Relations Board v. Baptist Hospital, Inc.*, 442 U.S. 773, 787–90, 99 S.Ct. 2598, 2606–08, 61 L.Ed.2d 251 (1979). In creating such presumptions, the agency's interpretation of its statutory authority need not be the only reasonable interpretation of such authority. "All that is needed to support [the agency's] interpretation

is that it has 'warrant in the record' and a 'reasonable basis in law.' " *State of New Jersey v. Department of Health and Human Services,* 670 F.2d 1262, 1283 (3d Cir. 1981), *quoting Unemployment Compensation Comm'n of Alaska v. Aragon,* 329 U.S. 143, 153–54, 67 S.Ct. 245, 250–51, 91 L.Ed. 136 (1946). My review of the record indicates the basic facts underlying the Policy Statement "are rationally related to [the Policy Statement's] presumed facts and the latter may be fairly inferred from proof of the former." (Lacey Opinion at p. 21.)

The "basic facts" giving rise to the Policy Statement's presumptions are (1) that a proposed UDAG project is within 50 miles of "an area from which there has been a significant current pattern of movement ... of jobs of the category for which [the project's speculative] space is appropriate;" (2) that there is a likelihood of continued such movement; and (3) that the area from which such movement has been occurring is "a distressed community." 50 Fed.Reg. 1505, 1506 (1985). Once these three basic facts are shown to exist, the Policy Statement provides that two additional facts may be presumed: (1) that the proposed UDAG project is "intended to facilitate the relocation of a facility from one area to another;" and (2) that the "relocation will significantly and adversely affect the level of unemployment and the economic base of the area from which the facility is presumed to be relocated." *Id.*

HUD's experience and expertise in administering and implementing the UDAG program prior to promulgation of the Policy Statement showed that proposed projects involving speculative space were resulting, or were close to resulting, in HUD-approved projects involving the facilitation of relocations. The before me record refers to two projects specifically, and refers to "other recent similar experiences" (Finkle Decl, 2/6/85, ¶¶ 11–15), in which evidence surfaced to suggest that speculative space in proposed UDAG projects was offered to potential relocatees from nearby distressed communities. Given such experience, it is not unreasonable to presume the proximity of a proposed

UDAG project to a distressed urban area from which there has been a migration of businesses and jobs suitable for relocation to the UDAG project's speculative space, will facilitate such relocation.

Moreover, HUD's defense of the Policy Statement's "reasonableness" is enhanced by the Policy Statement's explicit provision allowing for rebuttal of the presumption. 50 Fed.Reg. 1505, 1506–07 (1985). If implementation of the Policy Statement were to significantly impair HUD's discretion in administering the UDAG program, a reviewing court might well find the action capricious or an abuse of discretion. Where, as in this case, the agency action cannot be said to have created an irrebuttable "binding norm," however, the action cannot fairly be said to be capricious or abusive. *See Ryder Truck Lines,* 716 F.2d at 1381–86.

Jersey City further suggests the Policy Statement impermissibly places an unreasonable burden on UDAG applicants geographically proximate to distressed areas and whose applications contain projects in which speculative space is anticipated. The record, however, does not support Jersey City's claim. The Congressional statute creating the UDAG program, even prior to HUD's issuance of the Policy Statement, specifically precluded HUD from funding UDAG projects "intended to facilitate the relocation of industrial or commercial plants or facilities from one area to another, unless the Secretary finds that the relocation does not significantly and adversely affect the unemployment or economic base of the area from which the industrial or commercial plant or facility is to be relocated." 42 U.S.C.A. § 5318(h). Nothing contained in the statute itself, nor, indeed, in the legislative history to the statute, indicates how the Secretary is to determine whether a proposed UDAG project is "intended to facilitate" relocations. Moreover, it seems safe to assume Congress did not anticipate the problems confronting HUD in effectuating this anti-pirating provision when UDAG applications containing speculative space began to be submitted.

To address these problems, HUD issued the Policy Statement so as to clarify how

HUD intended to review UDAG applications, specifically in light of the anti-pirating provision, for proposed projects containing speculative space. As was the case prior to issuance of the Policy Statement, applicants assume some degree of responsibility to demonstrate an absence of factors giving rise to a reasonable HUD determination that a UDAG project is intended to facilitate relocations. However, the record also indicates distressed communities situated proximate to areas seeking UDAG funds also bear some responsibility for demonstrating a proposed project is likely to facilitate further migration from the distressed area. In the only example in the record of HUD's implementation of the Policy Statement's presumptions, HUD considered and rejected a distressed area's opposition to the proposed UDAG project. (Finkle Decl., 2/6/85, ¶ 23.) Accordingly, Jersey City's allegation that HUD has impermissibly burdened UDAG applicants is unfounded.

Finally, attention should be given to Jersey City's contention that "under the HUD scheme, [an applicant's] intention [to pirate] becomes irrelevant and even a forthright disavowal of intent to pirate is unavailing. The applicant becomes the helpless and unwitting victim of the geographic location of its project, even though the location itself admittedly qualifies in all respects for UDAG assistance." (Jersey City Brief, 4/7/87 at p. 24.) As an initial matter, the Policy Statement does not render intention irrelevant; rather, it proposes a means for determining intent in a given context—the context of UDAG applications containing projects with speculative space—in which an abstract notion of an "intention to facilitate relocation," would not otherwise be objectively determinable. Moreover, the characterization of Jersey City as an innocent victim of the Policy Statement's presumptions ignores the fact that absent the Policy Statement, HUD, other equally distressed areas and, ultimately, the public, are all likely to be "unwitting victims" to UDAG applicants or developers seeking to fill UDAG-financed speculative space.

*Conclusion*

The record before me indicates HUD's Policy Statement was not implemented in violation of the APA, and does not constitute an arbitrary or capricious agency action. Accordingly, HUD's motion for summary judgment is granted and Jersey City's motion for summary judgment is denied.