**UNITED STATES of America, Appellee,**

v.

**Nicholas L. BIANCO, Appellant.**

**No. 385, Docket 75–1244.**

United States Court of Appeals, Second Circuit.

Argued Nov. 3, 1975.

Decided April 8, 1976.

502

Gerald L. Shargel, New York City (James M. LaRossa, LaRossa, Shargel & Fischetti, New York City, of counsel), for appellant.

Charles E. Brookhart, Atty., Tax Div., Dept. of Justice, Washington, D. C. (David G. Trager, U. S. Atty., Brooklyn, N. Y., Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Robert E. Lindsay, Attys., Tax Div., Dept. of Justice, Washington, D. C., of counsel), for appellee.

Before HAYS, MULLIGAN and MES-KILL, Circuit Judges.

MESKILL, Circuit Judge:

Nicholas L. Bianco appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York after a jury trial before Thomas C. Platt, *District Judge,* of five counts of willfully failing to file income tax returns for the years 1967 through 1971 in violation of § 7203 of the Internal Revenue Code of 1954, 26 U.S.C. § 7203.

I.

Bianco claims on this appeal that the government failed to prove that he had sufficient income in the disputed years to require his filing of returns. Specifically, he asserts that the government failed to prove with "reasonable certainty" that his cash expenditures during the years in question had not been made either from assets on hand prior to those years or from nontaxable sources of income.

The government prosecuted the case by the "cash expenditure" method of proof, a variant of the "net worth" method, which permits circumstantial proof of a defendant's taxable income in cases where the prosecution is unable directly to show specific items of such income. These two indirect methods of proof have been explained and distinguished by the First Circuit in *Taglianetti v. United States,* 398 F.2d 558, 562 (1st Cir. 1968), *aff'd,* 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969) as follows:

"The net worth method involves the ascertaining of a taxpayer's net worth positions at the beginning and end of a tax period, and deriving that part of any increase not attributable to reported income. This method, while effective against taxpayers who channel their income into investment or durable property, is unavailable against the taxpayer who consumes his self-determined tax

free dollars during the year and winds up no wealthier than before. The cash expenditure method is devised to reach such a taxpayer by establishing the amount of his purchases of goods and services which are not attributable to the resources at hand at the beginning of the year or to non-taxable receipts during the year." (footnotes omitted).[1]

In the case at bar, the government proved, and Bianco does not contest, that he made expenditures in each prosecution year far in excess of the amount which, if the figure had been derived entirely from taxable income in that year, would have required him to file returns.[2] Nor does Bianco contest the prosecution's proof that no returns were filed by him in any of the prosecution years. His sole challenge to the sufficiency of the government's case rests upon his contention that it failed to prove that the expenditures were "not attributable to the resources at hand at the beginning of the year or to non-taxable receipts during the year." More specifically, Bianco contends that the government failed to satisfy the requirement of "the establishment, with reasonable certainty, of an opening net worth." *Taglianetti v. United States, supra,* 398 F.2d at 564.

The "reasonable certainty" requirement is derived from the Supreme Court's opinion in *Holland v. United States,* 348 U.S. 121, 132, 75 S.Ct. 127, 133–34, 99 L.Ed. 150, 162 (1954), a case which was prosecuted on the net worth rather than the cash expenditure theory and which involved a prosecution which attempted to show a specific deficiency rather than only income over the threshold amount necessitating the filing of tax returns. Nevertheless, the government properly concedes in the present case that the "reasonable certainty" standard applies in cash expenditure cases, albeit in a slightly different manner from that discussed in *Holland.*

"In a typical net worth case, as *Holland,* precise figures would have to be attached to opening and closing net worth positions for each of the taxable years to provide a basis for the critical subtraction. In a cash expenditures case reasonable certainty may be established without such a presentation, as long as the proof . . . makes clear the extent of any contribution which beginning resources or a diminution of resources over time could have made to expenditures." *Taglianetti v. United States, supra,* 398 F.2d at 565; *see also United States v. Fisher, supra,* 518 F.2d at 842 n. 7.

In the instant case, the government attempted to show that Bianco's beginning resources were non-existent and thus could not have contributed at all to his expenditures during the tax years. To that effect, Special Agent Louis Nahmias testified about his investigation into Bianco's financial background. He testified that he had examined the records of the Kings County Clerk's Office, the county in which Bianco had lived from 1962 through 1972, but could find no record of any real estate in Bianco's name. He testified further that he had circulated letters to approximately 100 banks in Brooklyn, all of which responded that they had no assets or accounts in Bianco's name. Nahmias further testified that he checked with a brokerage house in order to determine whether or not Bianco had had any securities holdings or dealings, which inquiry also produced negative results. He also testified that he made inquiries of insurance brokers, doctors, schools, hospitals, the telephone company, the electric company, and an attorney who

1. The quoted passage from *Taglianetti* was quoted with approval by this Court in *United States v. Fisher,* 518 F.2d 836, 841 (2d Cir. 1975), *cert. denied,* 423 U.S. 1033, 96 S.Ct. 565, 46 L.Ed.2d 407, 44 U.S.L.W. 3358 (1975).

2. In tax years 1967 through 1971, the evidence indicated that Bianco expended $4,284.68, $5,924.99, $9,898.25, $8,916.49 and $10,217.01 respectively. In each of the first three years,

1967, 1968 and 1969, taxpayers with gross income in excess of $600 were required to file tax returns. For the final two years of the prosecution period, because he had become married, the threshold gross income figure applicable to Bianco was $2,300. See Pub.L. 91–172, Title IX, § 941(a), 83 Stat. 726, amending § 6012 of the Internal Revenue Code of 1954, 26 U.S.C. § 6012.

had performed legal services for Bianco during the prosecution years. Finally, there was testimony that investigation had been made of the probate records in Providence, Rhode Island, where Bianco's family lived. Those records revealed no inheritance from either Bianco's mother or father, both of whom had passed away earlier. An interview with Bianco's sister was also conducted in Providence. These investigations failed to reveal any assets held by Bianco *at any time,* prior to or during the prosecution years.

■ The Government's case, however, did not rely entirely upon Agent Nahmias' testimony about his fruitless search for assets. It introduced Bianco's 1962 income tax return which reported only a modest wage or salary income for that year. There was also evidence introduced that Bianco had not filed tax returns for the years 1963, 1964 and 1965, the government thereby attempting to create the inference that the failure to file in those years negated the probability that Bianco had had sufficient income then to have accumulated assets on which to have lived during the later prosecution years.[3] Further, Samuel S. Sezzen, Esq., an attorney who has specialized in collection matters since 1936, testified that in the early part of 1966 he used his normal "general procedure" but was unable to locate any assets from which to satisfy a

$436.40 judgment entered earlier against Bianco.[4]

■ The totality of this evidence clearly was sufficient for the jury to have concluded that Bianco had insufficient assets at the beginning of the prosecution period to have supported his expenditures in any of those years. Bianco presented no defense and offered no evidence in this case. His major contention on appeal appears to be that the prosecution failed to negate the possibility of a so-called "cash hoard," although there is not one speck of evidence to indicate that Bianco had such a cache or where it might have come from. He points to the evidence elicited on the cross-examination of several prosecution witnesses that he had been making lavish expenditures during the latter part of 1966, just before the beginning of the prosecution period. Those expenditures, in the form of a down payment on an automobile and the "wining and dining" of a female acquaintance, according to Bianco, show that the government's case was fatally defective. Such evidence, however, does not tend to establish the existence of assets of any kind, since the jury could well have believed that Bianco was simply living from hand to mouth, spending whatever income he had at that point.

■ Of course, as in any criminal prosecution, the defendant is under no obligation to prove any particular set of facts, includ-

---

**3.** Bianco challenges the admission into evidence of his failure to file returns in those years as an unjustifiable use against him of his presumption of innocence. *See United States v. Schipani,* 362 F.2d 825, 829–30 (2d Cir.), *vacated and remanded,* 385 U.S. 372, 87 S.Ct. 533, 17 L.Ed.2d 428 (1966). In *Schipani* this Court described the use of such evidence as "unnecessary" given the complete and thorough exhaustion of sources of non-taxable income but failed to find its use a cause for reversal. Furthermore, in *Schipani,* the government's reliance upon the failure to file to show no income during those years appeared to have been inconsistent with proof tending to show that Schipani had had income in those years. There was no inconsistency in this case, there having been no proof of any income or expenditures made by Bianco in 1963, 1964 or 1965.

In any event, the admission of such evidence finds support, if not acceptance, in decisions of the Supreme Court and three other circuits, *see Smith v. United States,* 348 U.S. 147, 157, 75 S.Ct. 194, 199, 99 L.Ed. 192, 201 (1954); *United States v. Caserta,* 199 F.2d 905, 907 n. 5 (3d Cir. 1952); *Hanson v. United States,* 186 F.2d 61, 66–67 (8th Cir. 1950); *United States v. Skidmore,* 123 F.2d 604, 610 (7th Cir. 1941), *cert. denied,* 315 U.S. 800, 62 S.Ct. 626, 86 L.Ed. 1201 (1942), and, even assuming its admission to have been error, we find insufficient prejudice to the defendant to justify reversal here.

**4.** Although Sezzen's testimony did not reveal what, other than the service of an unfruitful restraining notice upon a bank near Bianco's last known address, that "general procedure" was, the fact that Sezzen discovered no assets was some evidence from which the jury could infer that they did not exist.

ing the existence of a non-taxable source, such as a "cash hoard" from which his expenditures were made. But once the government has introduced sufficient evidence from which the jury could conclude with reasonable certainty that no such assets existed, the defendant remains silent at his own peril. *Holland v. United States, supra,* 348 U.S. at 138–39, 75 S.Ct. at 136–37, 99 L.Ed. at 165–66; *United States v. Penosi,* 452 F.2d 217, 220–21 (5th Cir. 1971), *cert. denied,* 405 U.S. 1065, 92 S.Ct. 1495, 31 L.Ed.2d 795 (1972); *United States v. Schipani, supra,* 362 F.2d at 830.

■ Much of what we have said with respect to the government's duty to establish a lack of adequate funds from which the expenditures could have been made applies with equal or greater force to Bianco's contention that the government failed sufficiently to negate all other possible sources of non-taxable income during the prosecution years. As mentioned above, the government conducted a thorough investigation, including a search of the Providence, Rhode Island probate records and an interview with Bianco's sister in Rhode Island, in an attempt to discover whether or not he had been the recipient of any gifts, loans or inheritances. The investigation revealed no such non-taxable income nor any "leads" which the government neglected to investigate.[5] "Once expenditures are established, the government cannot be expected to conduct an exhaustive nationwide investigation when the defendant supplies no relevant leads as to where he got the money he admittedly spent." *United States v. Penosi, supra,* 452 F.2d at 220.

■ Bianco's major attack upon the government's investigation into possible sources of non-taxable income centers upon its failure to negate the possibility that Bianco had received an inheritance in Brooklyn or that his wife had received any inheritances. These *post hoc* suggestions, however, do not render insufficient the search that was conducted. There is nothing in the record to suggest that Bianco had any relatives in Brooklyn. To the contrary, it was apparent that Bianco's roots and family were located in Providence, Rhode Island. Similarly, from all that appears in the record, there was no reason for the government to have suspected that his wife had received an inheritance of any kind. To require the government to conjure up testators who may have contributed to Bianco's cause, without some suggestion as to who those persons may have been, would create a burden which the prosecution could never meet.

■ Finally, it should be noted that the government introduced evidence from which the jury could have inferred that Bianco was receiving income from taxable sources during the prosecution years. While that evidence was hardly conclusive, it was sufficient to show at least one "likely source" of taxable income. The government introduced a loan application, an insurance claim and a lease application, all of which were made by Bianco during the prosecution years and which indicated that Bianco was self-employed by the Easy Floorwaxing Company.[6] Further, there was direct testimony by a Manhattan businessman that Bianco personally had arranged for and delivered to him a $10,000 loan. The loan transaction carried with it weekly interest payments of $250 and has been properly characterized as a "loanshark"

5. It should be noted that Agent Nahmias' investigation of insurance companies uncovered a non-taxable $3,000 payment to Bianco in 1969 resulting from the theft of his automobile. That payment was properly credited against his expenditures in that year. Similarly, another non-taxable insurance payment of $1,750 to Bianco in 1968 was discovered and credited against that year's expenditures.

6. In the lease application, made in 1968, it was stated that Bianco had income of $125; it is not clear whether that was a weekly or monthly income.

Bianco claims that Agent Nahmias' testimony that he could not, after investigation, confirm the existence of the Easy Floorwaxing Company renders worthless Bianco's admissions of employment during the tax years. While these admissions are hardly conclusive when uncorroborated, they are nevertheless sufficient independent evidence since they were made under circumstances having nothing to do with the commission or investigation of the crime charged. *Cf. Warszower v. United States,* 312 U.S. 342, 347–48, 61 S.Ct. 603, 606–07, 85 L.Ed. 876, 880 (1941).

transaction. Although the testimony again was not conclusive with respect to how much of the interest payments went into Bianco's pockets as opposed to those of his associates, the jury was entitled to infer that Bianco's involvement in the transaction was not entirely altruistic and that at least part of the $2,000 interest paid during an eight week period in 1967 was income to him.

■ We need not hold on the state of the record in this case that such evidence of a "likely source" would be sufficient by itself to relieve the prosecution of the duty to negate probable sources of non-taxable income, *see Holland v. United States, supra,* 348 U.S. at 138, 75 S.Ct. at 136–37, 99 L.Ed. at 165–66, but merely that such evidence, together with the evidence of the government's fruitless search for sources of non-taxable income, is sufficient to support an inference by the jury that the expenditures proved were attributable to currently taxable income. *Cf. United States v. Massei,* 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517 (1958).

## II.

■ During the course of Agent Nahmias' testimony at trial, it was revealed that the Internal Revenue Service ("IRS") had maintained a "mail watch" on Bianco's incoming mail for almost ten years.[7] It was further revealed that the evidence of at least one of the expenditures proved at trial had been derived from the mail cover. Bianco neither objected to such evidence nor did he move to suppress it at trial; on this appeal he challenges its admission on the ground that the mail cover was an unreasonable search and seizure in violation of the Fourth Amendment. He seeks to circumvent the rule announced in *United*

*States v. Indiviglio,* 352 F.2d 276, 277 (2d Cir. 1965) (en banc), *cert. denied,* 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966), that generally "the failure to make proper objection before the trial court to the admission of the challenged evidence forecloses review of the asserted error" by claiming that this Court's decision in *United States v. Leonard,* 524 F.2d 1076 (2d Cir. 1975), *petition for cert. filed,* 44 U.S.L.W. 3429 (Jan. 16, 1976), significantly changed, after his trial, the prior law with respect to the constitutionality of mail covers, which prior law would have made objection at trial futile. See *United States v. Indiviglio, supra,* 352 F.2d at 280 and n. 7. We disagree and hold that Bianco's claim cannot be raised at this stage in the proceedings.

In *Ex parte Jackson,* 96 U.S. 727, 24 L.Ed. 877 (1878), the Supreme Court made clear that the Fourth Amendment prohibited the warrantless opening of sealed letters and packages except in cases involving incoming international mail, where the enforcement of the customs laws justifies an incursion into the sanctity of such mail. This Court, in *United States v. Costello,* 255 F.2d 876, 881 (2d Cir. 1958), *cert. denied,* 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958), *pet. for rehearing denied,* 358 U.S. 858, 79 S.Ct. 16, 3 L.Ed.2d 93 (1958), interpreted the *Jackson* opinion as necessarily implying that "without offense to Constitution or statute writing appearing on the outside of envelopes may be read and used." Bianco asserts that the *Costello* opinion made clear that any objection he might have made at trial would have been futile.

After Bianco's trial, this Court approved a mail cover employed by the IRS in *United States v. Leonard, supra.* The mail cover there involved the copying and recording of the postage meter numbers on all incoming mail from Switzerland which bore no return address. The object of that mail cover was to match the postage meter numbers on the envelopes with meter numbers registered to

---

7. Agent Nahmias was never asked to define what a "mail watch" was in the context of this case when he admitted that that technique was employed against Bianco. We shall assume, since there is no hint to the contrary in the record and since Bianco's brief in this Court so assumes, that the "mail watch" or "mail cover" involved only the inspection and recording of the names and return addresses on the envelopes in his incoming mail.

Swiss banks in an attempt to discover which American citizens might be using secret Swiss bank accounts to hide unreported income. In affirming the IRS's use of such a broad mail cover, which monitored all incoming Swiss mail to previously undetermined addresses, Judge Friendly commented that "[i]t may well be that, in these days of increased concern for the protection of privacy, the statement in *Costello* should not be read as an absolute, permitting, for example the Government to copy the outside of every envelope received by every citizen." *United States v. Leonard, supra,* 524 F.2d at 1087. Bianco's assertion now is that Judge Friendly's comment significantly changed the law of this Circuit with respect to the validity of mail covers by indicating that the Court will now hear objections to excesses in such investigative techniques where previously it would not. We disagree.

Judge Friendly's dicta in *Leonard* stated what should by now be obvious: that any particular investigative means, including mail covers, are subject to abuse and excesses, and that such excesses *might* serve to distinguish this Court's prior decision that the reading of the outside of an envelope does not violate any constitutional principles. The *Costello* case certainly was not to the contrary. Indeed, *Costello's* main thrust involved a determination as to whether or not the mail watch in that case violated federal statutes prohibiting interference with the mails, and thus, inferentially, violated standards of due process and fundamental fairness by securing a conviction on the basis of evidence derived from means which violated the law; its implication was that the Court would not sanction the use of such unlawful investigative means regardless of whether or not the mail watch was a "search" within the Fourth Amendment's domain. The Court, of course, found no infirmities, either statutory or constitutional, in the mail watch considered there. Thus, Judge Friendly's opinion in *Leonard* did nothing to alter the

*Costello* rationale; it merely recognized that most appellate decisions, including *Costello,* are capable of being distinguished on their particular facts. Significantly, *Leonard* expressed doubt, citing Mr. Justice Harlan's concurring opinion in *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576, 587 (1967), that the reading of the outside of envelopes in incoming international mail could violate anyone's "reasonable expectation of privacy" and thus the Fourth Amendment, since such mail is subject to inspection and opening in aid of the enforcement of the customs laws. Given that doubt, the comment in *Leonard* to the effect that an overbroad mail cover *may* not pass constitutional muster obviously refers to concerns falling outside of the Fourth Amendment's scope, that is, due process concerns existing long before Bianco's trial.

We of course express no opinion as to whether or not the mail cover in this case involved such excesses or abuses that would offend principles of due process or any statutory prohibitions. Bianco's remedy was to move to suppress or to object to any evidence derived from the mail cover. Having failed to do so, he cannot now assert his challenges to the mail cover in this Court. *United States v. Indiviglio, supra.*

### III.

■ Bianco's final claim, raised below and decided against him after a full evidentiary hearing, is that the federal tax prosecution was derived from testimony given by him in a state Grand Jury under a grant of transactional immunity. *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). Bianco testified before that Grand Jury on five occasions from March through June of 1970.[8] Bianco points to several questions asked by the state District Attorney, David Katz, which involved the fact that Bianco had made

---

**8.** Bianco also appears to have testified before a federal Grand Jury, but he does not claim on this appeal that his appearance there under a grant of immunity was in any way misused.

certain expenditures, that he had received income from at least one source and that he had not filed federal tax returns. According to Bianco "[t]he very nature of these questions suggest [sic] circumstantial support that this testimony may have indeed provided the prime moving force for . . . [his] subsequent tax prosecution."[9]

Bianco points out that once he has demonstrated that he testified under a grant of immunity at a state Grand Jury with respect to the subject of a subsequent federal prosecution, the burden is on the government not only to show that its evidence was not tainted by or derived from that testimony but also to show that its evidence was secured from independent legitimate sources. *Kastigar v. United States, supra,* 406 U.S. at 460, 92 S.Ct. at 1664-65, 32 L.Ed.2d at 226; *Murphy v. Waterfront Comm'n, supra,* 378 U.S. at 79 n. 18, 84 S.Ct. at 1609, 12 L.Ed.2d at 695.[10] At a hearing based upon Bianco's contentions, the government produced two witnesses, David Katz, the state District Attorney who had questioned Bianco in front of the Grand Jury, and Agent Nahmias, who was the case agent handling Bianco's investigation after the Grand Jury appearance. After hearing these two witnesses and after reviewing the government's entire file on the Bianco investigation, the district court allowed the case to proceed. We find that the district court's decision is supported by the evidence adduced at the hearing.

Agent Nahmias testified that he had not been aware of the fact that Bianco had testified before any Grand Jury until shortly before the instant hearing and that he had at that time still not seen the transcript of the state Grand Jury testimony. He further testified that he never had any contact with any state officials who had been involved in the Grand Jury proceedings. He testified that he conducted the investigation entirely on his own but conceded that there had been other federal agents connected with the Brooklyn Organized Crime Task Force with whom he had consulted during the course of his investigation and that when he began his investigation in September, 1971, he consulted both FBI reports on Bianco and a report of a prior IRS Intelligence Division agent's investigation, which report and investigation were concluded significantly prior to Bianco's Grand Jury appearance.[11] District Attorney Katz testified that he had not had any conversation or discussions with any federal agents or authorities with respect to the Bianco Grand Jury appearance. He stated that the minutes of the Grand Jury proceeding had been kept under lock and that only he and a clerk in his office had access to the file. According to Katz's testimony, Bianco's appearance before the Grand Jury had been in connection with an investigation into a shooting and alleged industrial and labor racketeering in Brooklyn; he could not recall his reason for asking Bianco his source of income and whether or not he had filed tax returns. He was sure, however, that he had not been requested to ask those questions by federal authorities and that he had not communicated the results to them, nor to anyone else other than perhaps his superior or another district attorney.

---

**9.** Appellant's brief p. 43.

**10.** At oral argument the government urged that if it proved that it had no access to the immunized testimony, it would be relieved of the burden of showing the independent legitimate sources of its evidence. Arguably, one could read both *Kastigar* and *Murphy* as having assumed that federal prosecutorial officials would be aware of the immunized testimony, and that given such knowledge, the non-use, alternative source burdens must then be applied. Given our view that the government met both *Kastigar* burdens in this case, we express no opinion on the government's argument.

**11.** At defense counsel's suggestion and with the prosecution's full agreement, the district court examined the entire government file including the FBI reports *in camera* in an attempt to eliminate the need to call as witnesses other federal agents. The court indicated that there was nothing in the file indicating that the state Grand Jury proceedings were ever referred to. It should be noted that upon this Court's request, the file was sealed and transmitted to us for our complete examination.

It developed at the hearing that there was one possible link between the District Attorney's Office and the Brooklyn Organized Crime Task Force. That link was Detective John Capabianco, the liaison officer between the two offices. Katz testified, however, that he had not discussed Bianco's testimony with Capabianco. Further, near the close of the hearing, the government offered by letter to the court and to defense counsel to produce Capabianco and indicated that Capabianco would testify that he had not given any information from the Bianco Grand Jury proceedings to any federal authorities. The district court and the defense apparently felt that the government's representation was sufficient since the hearing ended with Katz's testimony.

The evidence as described was certainly sufficient to demonstrate not only that the federal prosecution made no use of Bianco's immunized testimony but also that it had no access to it or knowledge of its existence. While it might have been better for the government to have placed certain other IRS revenue and intelligence agents on the stand to testify as to their lack of knowledge of the testimony, Mr. Katz's testimony that he had not transmitted outside of his office any information about Bianco's appearance is sufficient to show no use by federal agents of any information garnered from that appearance. Admittedly, there was no intentionally erected "Chinese wall" between the state District Attorney's Office and the federal agents, cf. United States v. Sapere, 531 F.2d 63 (2d Cir. 1976), but the record is sufficient to demonstrate that no information trickled through the natural barriers between the state and federal authorities.

The proof at the hearing was also sufficient to demonstrate that the government's tax prosecution arose from sources independent from the immunized testimony. At the Grand Jury, Bianco testified that he had not filed federal tax returns, that he made his living by betting on horses, that he had been in an unsuccessful business called "Easy Floorwaxing," that he paid $215 per month in rent on his apartment and that he had purchased an automobile from Kaplan Buick, which automobile was financed through Bankers Trust Company. He thus testified about nonfiling, possible sources of taxable income and possible expenditures, all items of interest to the government's tax prosecution. Agent Nahmias' testimony, together with the file examined by the district court, showed independent sources for all of these items.

Bianco claims that his admission that he had income from gambling and that he had not filed returns created the impetus for the present prosecution. The fact that Bianco had not been filing federal income tax returns since 1963, however, was nothing new to the IRS. Bianco had been the subject of a continuing intelligence division investigation long before his Grand Jury appearance. That initial investigation for the earlier tax years was closed with a report by Special Agent Langone, dated December 27, 1968, because that agent could not prove sufficient expenditures for those years to warrant prosecution. Agent Nahmias testified that, although that phase of the investigation had been closed, the IRS had maintained a continuous active interest in Bianco's status as a taxpayer. Bianco's claim that his admission before the Grand Jury of non-filing was the spur behind his tax prosecution seems to be disingenuous. Bianco's reference to gambling as a source of income was also information readily available to Agent Nahmias from a source not connected with the Grand Jury. Nahmias testified that after he was assigned to the case he examined Bianco's arrest record at the New York City Police Department. That record included an arrest for gambling. It should also be noted that when Agent Nahmias filed his report recommending prosecution, he did not include gambling as a source of Bianco's income.[12]

Similarly, evidence that the prosecution did use at Bianco's trial also came from sources other than the Grand Jury. Agent

___

12. That source was never used by the prosecution in the presentation of its case.

Nahmias' report indicated that Bianco's possible sources of taxable income were from his loansharking activities and from his connection with the Easy Floorwaxing Company. The loansharking obviously came from a source other than the immunized testimony since that activity was never discussed at the Grand Jury.[13] Although Agent Nahmias did not specifically indicate where he had obtained the leads to the Easy Floorwaxing Company as a source of income, Agent Langone's file, closed prior to Bianco's Grand Jury appearance, contained references to that business activity. Finally, the Kaplan Buick and Bankers Trust Company references, used by the prosecution both as an expenditure and as a lead to Easy Floorwaxing, as well as references to rent paid by Bianco, were also contained in Agent Langone's pre-Grand Jury file. The FBI file also contained reports, dated prior to the Grand Jury appearance, in which the financing of Bianco's car through Bankers Trust Company was mentioned.

Thus it is clear that all of the information contained in Bianco's testimony which could have been used by Agent Nahmias in his investigation, with the possible exception of the gambling source of income which was never used as such by the prosecution, was already known to federal agents prior to that testimony. It is obvious that information possessed prior to the Grand Jury appearance is information derived from sources other than that appearance.[14]

Affirmed.

13. Mr. Katz did ask Bianco if he was engaged in a loan business; Bianco replied in the negative.

14. Bianco also contends that the entire trial was prejudiced because the prosecuting attorney had read the transcript of the immunized testimony prior to trial, citing primarily *United States v. McDaniel*, 482 F.2d 305 (8th Cir. 1973). Aside from the fact that Bianco failed to raise this contention below, we find *McDaniel* to be inapposite and the argument to be otherwise without merit. In *McDaniel* the prosecutor had read the entire transcript prior to his knowing that it had been immunized and prior to the indictment in that case having been filed. The *McDaniel* court concluded that the prosecutor's "use" of the testimony could in-

clude such things as "assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea-bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy." *United States v. McDaniel, supra,* 482 F.2d at 311.

Here the prosecutor read the transcript only in preparation of the government's defense to Bianco's motion to dismiss. The investigation of the case was already complete and, as has been pointed out in the text, that investigation already contained and the prosecutor already knew everything in the testimony germane to the tax case. The only "use" to which the prosecutor could have put his reading of the transcript was to defend against the motion to dismiss.