UNITED STATES of America,

v.

Martin SCHWIMMER, Defendant.

No. 87 CV 423(SS).

United States District Court,
E.D. New York.

May 31, 1990.

Alan M. Friedman, Asst. U.S. Atty., Andrew J. Maloney, U.S. Atty., E.D.N.Y., New York City, for U.S.

Dershowitz & Eiger, P.C., New York City (Nathan Z. Dershowitz, of counsel, for defendant.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

### PRIOR PROCEEDINGS

A jury convicted defendant of RICO conspiracy, 18 U.S.C. § 1962(d); receiving illegal payments to influence the operations of employee benefit plans, 18 U.S.C. § 1954; conspiracy to defraud the United States, 18 U.S.C § 371; and attempted tax evasion, 26 U.S.C § 7201. Defendant appealed his conviction, arguing that, among other things, he was entitled to a hearing "to determine whether his attorney-client, sixth amendment and work product privileges were violated by the use of information, documents and grand jury testimony furnished by an accountant hired to assist the attorneys representing Schwimmer and a co-defendant in the conduct of a joint defense." *United States v. Schwimmer*, 892 F.2d 237, 238 (2d Cir.1989).

The Second Circuit remanded the case to this Court for a hearing and findings of fact concerning the privilege issue. *Id.* at 239. Specifically, the Court of Appeals directed this Court to determine whether the government's case "was in any respect derived from a violation of the attorney-client privilege in regard to confidential communications passing from Schwimmer to Glickman." *Id.* at 245. If the answer is yes, I am then to determine "what use was made of the derivative information and whether a substantial right of the [defendant] was affected." *Id.*

### FACTS

Defendant Schwimmer's conviction resulted from the government's investigation of First United Fund, Ltd. ("First United"), a Long Island brokerage firm engaged in placing certificates of deposit for small banking institutions. The facts surrounding the First United investigation and Schwimmer's conviction have recently been reviewed in detail by the Second Circuit. *See Schwimmer*, 892 F.2d at 239–43. Familiarity with the Second Circuit's opinion is presumed.

Defendant and his confederate, Mario Renda, were involved in a financial scheme. The scheme involved the funneling of commissions derived from benefit plan investment activities into six bank accounts known as the "off book accounts." These accounts were not reflected on the books of First United and "were not reported to the Internal Revenue Service or First United's outside accountants." 892 F.2d at 240.

Defendant withdrew money from the off book accounts by negotiating checks from such accounts through cooperating cash-laden businesses. Businesses cashing checks included Nu–Service, All–County Tobacco, Crown Confection and various other entities owned by Allen Gouz.

In the early 1980's the government began investigating First United, Schwimmer

and Mario Renda. Upon learning that they were subjects of an investigation, Schwimmer and Renda each retained counsel. Schwimmer was represented by Robert S. Fink of Kostelanetz Ritholz Tigue & Fink. Mr. Renda was represented by Ronald Russo and Larry J. Silverman of Russo, Silverman and Vitaliano.

Schwimmer, Renda and their counsel cooperated in matters of mutual concern, thereby conducting a "joint defense." 892 F.2d at 244. In June 1984 attorney Silverman hired a certified public accountant, Ralph Glickman, to "analyze the financial transactions in which [Schwimmer and Renda] had engaged as well as the tax consequences of those transactions." 892 F.2d at 241.

Schwimmer's attorney, Robert S. Fink, instructed Schwimmer to "speak freely" with Glickman. The Second Circuit found that Schwimmer communicated with Glickman orally and through counsel, but the Court made no finding as to the substance of such communications.

In October 1984 the government searched First United's offices pursuant to a warrant. As a result of the search, Internal Revenue Service ("IRS") Special Agent Francis R. Devine received various financial books and records, receipts, disbursement ledgers, cancelled checks, wire transfer documents, a listing of bank accounts and debit and credit memoranda. (Tr. 11).[1]

In late 1985 or early 1986, agent Devine was joined in his investigation by IRS Special Agent Eugene L. Brozen. (Tr. 44). Agents Brozen and Devine centered their investigation on documentary material recovered from First United's offices. (Tr. 11).

Through their field investigations and through inspection of the cancelled checks, agents Brozen and Devine were able to allocate proceeds from the off book accounts to the income of Schwimmer and Renda. (Tr. 60). Agents Brozen and Devine then prepared a set of spreadsheets reflecting these allocations and the agents'

calculations. In May 1987 the spreadsheets were "submitted to Washington" so it could be determined what tax charges, if any, should be brought against Schwimmer and Renda. (Tr. 17, 86, 110).

On July 2, 1987 and July 27, 1987, accountant Glickman testified before the grand jury which ultimately indicted Schwimmer and Renda. This was Mr. Glickman's first contact with the prosecution team. (Tr. 17–18, 47, 132).

During his grand jury testimony, Mr. Glickman asserted the attorney-client privilege when asked to describe the records he had examined at the behest of attorney Silverman. 892 F.2d at 241. Based on the attorney-client privilege, Mr. Glickman also refused to answer questions pertaining to "the 1984 tax return of a corporation known as 'First United Air, Inc.'" *Id.*

Mr. Glickman did, however, testify before the grand jury that he provided commission figures for Renda's 1983 and 1984 tax returns to Renda's accountant, David Cohen. Glickman also testified that those figures were based on an analysis he performed for attorney Silverman and on certain work papers (the "Work Papers") that Glickman refused to discuss before the grand jury. 892 F.2d at 241.

Thereafter Mario Renda decided to plead guilty. In connection with Renda's guilty plea, Glickman met with the prosecution on April 29, 1988 and May 6, 1988 to resolve the amount of forfeiture to be paid by Renda pursuant to his plea. Negotiations among the Government, Mr. Glickman, Mr. Renda and Renda's counsel led to an agreement by the conclusion of the May 6 meeting. (Tr. 49, 135).

On August 18, 1988 a third meeting was held between Mr. Glickman and the prosecution. At this time Assistant United States Attorney Bruce Maffeo asked Glickman to describe what information he used to prepare the Work Papers. (Tr. 137, 147). Mr. Glickman stated that the Work Papers were based on a scheduling of bank accounts and the work papers of Joseph DeCarlo. (Tr. 137). (Mr. DeCarlo is a for-

---

**1.** The designation "Tr." in this opinion refers to the remand hearing transcript.

mer First United employee who maintained the records of Schwimmer and Renda's financial scheme prior to DeCarlo's cooperation with the government in 1987. 892 F.2d at 239, 240; (Tr. 137)).

After the August 18 meeting, Mr. Maffeo instructed agent Brozen to inspect the Work Papers at Glickman's office. (Tr. 138). Approximately one week later, agent Brozen and Special Agent Marvin Friedman of the Department of Labor visited Mr. Glickman's office and examined the Work Papers. (Tr. 56). After copying some of the Work Papers, agent Brozen informed Mr. Maffeo that the Work Papers did not contain any new substantive information affecting the prosecution's case. (Tr. 57, 153).

At the close of testimony in Schwimmer's original trial, I concluded that neither Glickman's grand jury testimony nor the government's acquisition of the Work Papers led to a violation of Schwimmer's attorney-client privilege. Schwimmer appealed this conclusion and the Second Circuit remanded for a hearing to determine (i) whether the government's case was in any respect derived from a violation of Schwimmer's attorney-client privilege, (ii) what use, if any, was made of the privileged information, and (iii) whether such use affected a substantial right of defendant. 892 F.2d at 245.

## DISCUSSION

### I. THE ATTORNEY–CLIENT PRIVILEGE

The attorney-client privilege protects confidential communications between a client and his lawyer relating "to the subject matter upon which professional advice is sought ..." *Schwimmer*, 892 F.2d at 243. In the ordinary case there is but one lawyer and one client. Where multiple parties and their counsel conduct a cooperative defense of a common interest, the "joint-defense privilege" or "common interest rule" extends the attorney-client privilege to communications passing from one party to another party's lawyer. *See Schwimmer*, 892 F.2d at 242–243. In this case, the Second Circuit has already concluded that

the common interest rule expands the attorney-client privilege to the joint defense team assembled by Schwimmer and Renda.

Again, in the ordinary case the privileged communication runs directly between the attorney and the client. As litigation becomes more complex, however, it is increasingly common for lawyers to turn to outsiders to interpret and analyze technical information. Accountants are a classic illustration. As recognized by the late Judge Friendly "[a]ccounting concepts are a foreign language to some lawyers in almost all cases, and to almost all lawyers in some cases." *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir.1961). Accordingly, communications are privileged when they are made to an accountant by a lawyer's client to enable the lawyer, with the technical assistance of the accountant, to render more informed legal advice. *Schwimmer*, 892 F.2d at 237; *Kovel*, 296 F.2d at 922.

Accountant Glickman was hired by Larry J. Silverman, attorney for Mario Renda, to analyze the financial transactions that were the subject of the government's investigation. 892 F.2d at 241. Because Schwimmer and Renda were conducting a joint defense, communications made to Glickman by Schwimmer in furtherance of the joint defense were privileged, even though neither Schwimmer nor his attorney had retained Glickman. *Id.* at 244.

The Second Circuit found that Schwimmer did in fact communicate with Glickman, but it made no finding as to the substance of such communications. *See id.* at 244. The government now contends that there were no *substantive* communications between Schwimmer and Glickman and, therefore, that Schwimmer's attorney-client privilege could not have been violated. (Gov't Reply Letter at 2). Schwimmer maintains that because the Second Circuit found that Schwimmer spoke at length with Glickman, the existence of substantive confidential communications has already been determined as "the law of the case." (Def. Reply at 4).

No evidence as to the contents of the communications between Schwimmer and

Glickman was presented at the remand hearing. While I am not persuaded that Schwimmer's position is correct, I shall assume that Schwimmer did convey substantive privileged information to Glickman.

### A. *Derivative Use of Privileged Information*

During Schwimmer's trial, the government did not offer into evidence Glickman's grand jury testimony, Work Papers, or any statements by Glickman. Schwimmer concedes as much, but contends that the government used all this information to develop leads and to prepare for trial. *Schwimmer*, 892 F.2d at 244–45. Thus, the core issue is whether the government's case against Schwimmer was in any respect derived from information obtained in violation of the attorney-client privilege and, if so, whether such derivative use of privileged information violated any of Schwimmer's substantial rights. *Schwimmer*, 892 F.2d at 245.

The problem of "derivative use" typically arises when a defendant invokes the Fifth Amendment privilege against self-incrimination and is subsequently compelled to testify under a grant of immunity. *See, e.g., Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Once testimony is compelled, the prosecution may not make any use or derivative use of the compelled testimony. *Id.* at 453–54, 92 S.Ct. at 1661.

If the government chooses to prosecute a person who testified under a grant of immunity, the government bears the "heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." *Id.* 92 S.Ct. at 1665. Schwimmer contends that the government bears the same "heavy burden" of proof in this case because of the government's "intrusion into the sanctuary of the attorney-client privilege." (Def. Mem. at 15).

Because I conclude that the government has satisfied the "heavy burden" described in *Kastigar*, I may assume, without deciding, that the defendant's contention is correct.

## II. GLICKMAN'S COMMUNICATIONS WITH THE PROSECUTION

Prior to seizure of the Work Papers, Glickman spoke with the prosecution on five occasions—twice before the grand jury in July 1987 and three times in 1988 at the offices of the Organized Crime Strike Force in the Eastern District of New York. I conclude that Schwimmer's attorney-client privilege was not compromised in any of these five instances.

### A. *Glickman's Grand Jury Testimony*

During his grand jury testimony Mr. Glickman frequently invoked the attorney-client privilege, refusing to disclose any substantive information concerning work he performed in connection with Schwimmer and Renda's joint defense. (Glickman Gr. J. Test. of 7/2/87 at 6, 22, 32, 37, 38). Glickman did testify that he analyzed records for attorney Silverman, prepared work papers and provided figures for certain tax returns. (Glickman Gr. J. Test. of 7/2/87 at 6–7, 9–10, 20, 22, 333). He did not, however, provide any substantive insight into the details of these efforts (*See* Glickman Gr. J. Test. of 7/2/87 at 32).

Significantly, Mr. Glickman testified before the grand jury that he had no substantive discussions with Schwimmer or any of Schwimmer's representatives. (Glickman Gr. J. Test. of 7/2/87 at 35–36, 38–40). It is also noteworthy that the post-hearing submissions of Schwimmer's counsel do not now contend that Glickman's grand jury testimony was used, directly or indirectly, in violation of Schwimmer's attorney-client privilege.

### B. *Meetings of April 29, 1988 and May 6, 1988*

Subsequent to his grand jury testimony, Glickman met with the prosecution three times. The first two of these meetings were held on April 26, 1988 and May 6, 1988. Schwimmer's counsel now states that these meetings were held "ostensibly for purposes of arriving at a dollar forfeiture appropriate for co-defendant Renda's guilty plea." (Def. Mem. at 5). If this is

meant to imply a more sinister motive on the part of the government, the evidence supports foursquare the conclusion that the purpose of the meetings was to resolve the forfeiture amount to be paid by Renda.

Mr. Glickman attended the meetings at the request of Renda's attorneys, Mr. Fischetti and Mr. Russo. (Tr. 134). During the meetings Messrs. Glickman, Fischetti, Russo and Renda attempted to negotiate a reduction in the forfeiture payable by Renda. (Tr. 29–30, 34–35, 48–49, 135, 151–157). After the May 6 meeting, Renda agreed to forfeit a sum less than the amount originally demanded by the government. (Tr. 150).

At these meetings agent Devine was one of the principal negotiators for the government. (Tr. 150–151). He testified that the forfeiture negotiations did not result in Schwimmer's being charged with any income initially charged to Renda. (Tr. 40). Agent Devine believed that there was not even a mention of defendant Schwimmer at the meetings. (Tr. 40).

Agent Brozen also participated in the meetings, and his testimony corroborates that of agent Devine. Before the meetings the government learned, through the cooperation of Joseph DeCarlo, that Glickman mistakenly charged Renda with $1 million in wire transfers that should properly have been charged to Schwimmer. (Tr. 50–52, 111). Glickman debited the wire transfers to Renda "only because he couldn't disprove the fact that Renda had gotten the money." (Tr. 50, 52). Agent Brozen testified that discussion of this matter was the only time Schwimmer's name was mentioned. (Tr. 50, 52). Agent Brozen also testified that Glickman never suggested that income charged to Renda should have been charged to Schwimmer. (Tr. 52, 111).

Bruce Maffeo attended only parts of the April and May meetings, but he recalled that the substance of the meetings pertained to the forfeiture amount to be paid by Mario Renda. (Tr. 135, 150–153). According to Mr. Maffeo, Glickman's negotiations concerning Renda's forfeiture were "the end of Mr. Glickman at that point" in the case. (Tr. 135).

Thus, the only discussion pertaining to Schwimmer at the April and May meetings was the $1 million in wire transfers that Glickman had improperly charged to Renda. This item was discussed because prior to the meetings the government had learned, through Joseph DeCarlo, that the wire transfers should have been charged to Schwimmer. (Tr. 111). No other substantive discussions concerning Schwimmer took place. Accordingly, I find that the government did not obtain privileged information from Glickman in the meetings held in April and May of 1988.

### C. *The August 18, 1988 Meeting*

■ Glickman's final meeting with the government was held in the Strike Force offices on August 18, 1988. Mr. Maffeo "set the agenda" for this meeting because he wanted to speak with Mr. Glickman. (Tr. 147).

At the outset of the meeting Mr. Maffeo cautioned Mr. Glickman that the government "did not want to know any conversations that had occurred between Mr. Glickman and either Mr. Schwimmer or any of the lawyers involved." (Tr. 136). Mr. Glickman told Mr. Maffeo that he had not had any substantive discussions with Schwimmer or attorney Fink. (Tr. 137, 147). Further, Mr. Maffeo and Mr. Glickman did not discuss any conversations Glickman might have had with the Russo, Silverman firm. (Tr. 137).

Mr. Maffeo testified that the substantive portion of the meeting consisted of his questioning Glickman about the records Glickman used in preparing the Work Papers. (Tr. 137, 147). Mr. Maffeo did not inquire into the figures that Glickman ultimately arrived at in the Work Papers, and Mr. Glickman did not volunteer them. (Tr. 147–148). According to Mr. Maffeo, he confined his inquiry to the records examined by Glickman without venturing into the substance of Glickman's analysis because the case agents had already derived their own figures—figures which Mr. Maffeo had confidence in, provided that they were based on the proper records. (Tr. 147–148).

The testimony on remand makes clear that Mr. Maffeo did not inquire into any confidential communications Glickman might have had with the Schwimmer defense camp. Accordingly, I conclude that the August 18, 1988 meeting did not result in any violation of Schwimmer's attorney-client privilege.

## III. THE WORK PAPERS

After the August 18, 1988 meeting, Mr. Maffeo directed agent Brozen to go to Mr. Glickman's office and examine Mr. Glickman's work papers. (Tr. 65, 138). On approximately August 25, 1988 agent Brozen, accompanied by agent Marvin Friedman, went to Mr. Glickman's office and examined the Work Papers. (Tr. 64–66).

While at Glickman's office, agent Brozen asked that some of the Work Papers be copied. (Tr. 56). Upon completing his review of the Work Papers, agent Brozen reported to Mr. Maffeo that there was nothing new in the Work Papers to affect the prosecution's case. (Tr. 56–57, 138).

Subsequently, the Work Papers were stored in the Strike Force offices. (Tr. 21, 56, 153). On November 11, 1989, the Work Papers were sealed. (Tr. 20). This seal was not broken until the morning of the remand hearing. (Tr. 20).

### A. *Derivative Use*

■  As previously noted, the major issue on remand is whether the government made any derivative use of information protected by Schwimmer's attorney-client privilege. This brings the Glickman Work Papers into sharp focus.

The Second Circuit has already said that the "information [Schwimmer] furnished to Glickman ... was protected by the attorney-client privilege." *United States v. Schwimmer*, 892 F.2d 237, 244 (2d Cir. 1989). The Second Circuit did not, however, find that any privileged information was embodied in the Work Papers; I have assumed that it was. I have also assumed that, under *Kastigar*, the government bears the "very heavy burden" of proving that its case was not in any respect derived from such privileged information.

At the remand hearing, agent Brozen testified that, after reporting that the Work Papers contained no new information, he never again discussed the Work Papers with Mr. Maffeo. (Tr. 57, 110). Agent Brozen also testified that he never discussed the Work Papers with agent Devine or agent Friedman. (Tr. 57, 119). Moreover, agent Brozen testified that he did not in any way use information obtained by examining the Work Papers. (Tr. 114).

Agents Devine and Brozen shared primary responsibility for preparing the financial aspects of the case. (Tr. 154–155). Agent Devine testified that he never possessed the Work Papers. (Tr. 37). Agent Devine also testified that he never discussed the Work Papers with agent Brozen. (Tr. 37).

Finally, Mr. Maffeo testified that he never even looked at the Work Papers before the remand hearing (Tr. 139), that he never spoke with agent Brozen about them (Tr. 138), and that he never discussed their substance with agent Marvin Friedman, agent Devine or Alan Friedman, an Assistant United States Attorney who assisted with Schwimmer's prosecution. (Tr. 139–140). In Mr. Maffeo's view, retrieval of the Work Papers "was a complete non-event" undertaken in an "abundance of over-preparation." (Tr. 157).

Despite this compelling testimony, Schwimmer maintains that the government has not adequately established that it did not make impermissible subtle uses of the Work Papers. (Def. Mem. at 41). Specifically, Schwimmer contends that agent Brozen's report to Mr. Maffeo that the Work Papers contained "nothing new" was, in and of itself, an impermissible "use" because it confirmed that the government's case was on solid ground. (Def. Mem. at 42). Schwimmer further contends that the government may have used the Work Papers when preparing cross-examination or when deciding whether to emphasize a certain piece of evidence. I reject these arguments.

In *United States v. McDaniel*, 482 F.2d 305 (8th Cir.1973), the Eighth Circuit recognized that subtle, indirect uses of immunized testimony "could conceivably include assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea-bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy." *Id.* at 311. In *United States v. Mariani*, 851 F.2d 595 (2d Cir.1988), the Court of Appeals declined to follow *McDaniel* to the extent that it "can be read to foreclose the prosecution of an immunized witness where his immunized testimony might have tangentially influenced the prosecutor's thought process in ... preparing for trial ..." *Id.* at 600.

In *Mariani*, the District Court had found that immunized testimony was improperly used by the prosecution (i) in deciding whether to prepare cross-examination of the defendant, (ii) to corroborate testimony of government witnesses, and (iii) to confirm information possessed by the prosecution. *Id.* at 599. The Second Circuit reversed, stating that such uses "were wholly conjectural and insubstantial." *Id.* at 601.

As in *Mariani*, the uses alleged by Schwimmer are "wholly conjectural and insubstantial." The testimony indicates that the government, through Mr. Maffeo, answered "ready for trial" in March 1988, well before the Work Papers were recovered. (Tr. 156). The government's readiness was based solely on the investigative work of the agents involved. (Tr. 17–18, 86–87, 102, 105–106, 110–111, 147–148, 156–157). At most, the subsequent recovery of the Work Papers confirmed information already held, in substance, by the prosecution.[2] Mere confirmatory "use" is precisely the type of use dismissed by the Second Circuit as "wholly conjectural and insubstantial." *Mariani*, 851 F.2d at 601.

Schwimmer also contends that the Work Papers could have been used to prepare cross-examination or in deciding whether to emphasize or de-emphasize certain evidence. The simple answer to these contentions is that no such use of the Work Papers was made (Tr. 21–22, 114, 157). The only witness cross-examined by the government was cross-examined by Assistant United States Attorney Alan Friedman. Mr. Friedman neither saw the Work Papers nor discussed them with Mr. Maffeo or agent Brozen. (Tr. 57–139). Additionally, even if the Work Papers corroborated government evidence, the record indicates that the government did not choose to emphasize such evidence. (Tr. 156–157). The mere corroboration of government evidence, without more, is another "use" the Second Circuit has found to be "conjectural and insubstantial." *Mariani*, 851 F.2d at 600–601.

Based on the overwhelming evidence presented at the remand hearing, and the Second Circuit's guidance in *Mariani*, I conclude that the Work Papers were not directly or indirectly used by the government in contravention of any of Schwimmer's rights.

B. *Legitimate Independent Sources of Proof*

■ Schwimmer correctly states that, under *Kastigar*, the government does not satisfy its burden merely by demonstrating non-use of tainted evidence. (Def.Mem. at 39–40). Assuming *Kastigar* applies, the government must also prove that its evidence was obtained from legitimate independent sources. *United States v. Bianco*, 534 F.2d 501, 509 (2d Cir.), *cert. denied*, 429 U.S. 822, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976); *see United States v. Nemes*, 555 F.2d 51, 55 (2d Cir.1977).

The testimony on remand demonstrates that the government's case was principally derived from the field investigations of agents Brozen and Devine. The foundation for these investigations was the documentary evidence recovered from First United's offices.

Included among the documentary evidence were several cancelled checks drawn

---

2. As discussed below, the figures in the Glickman Work Papers were not always identical to those in the agents' spreadsheets. It was, however, agent Brozen's view that the Work Papers contained "nothing new", and that it is all he reported to Mr. Maffeo. (Tr. 107, 138).

on the off book accounts. Agents Brozen and Devine analyzed the checks to determine who got the money. In some instances the agents were able to make this determination by merely inspecting the checks. (Tr. 11, 45). Inspection of certain checks, however, did not reveal where the funds they represented came to rest.

In these instances, agents Brozen and Devine attempted to allocate the checks' proceeds between Schwimmer and Renda by examining the "back end" of each transaction. (Tr. 11, 45–46). First, the agents examined the checks to determine where they were negotiated. Next, agents Brozen and Devine interviewed the principal of the business which cashed the check to determine who received the check's proceeds. The principal of Nu–Service, All–County Tobacco and Crown Confection was Bill Brooks. (Tr. 14–15, 46–47). Allen Gouz was the principal of various entities operating under the Gouz name. (Tr. 12–14).

Thus, the record indicates that the case against Schwimmer was derived from evidence uncovered by agents Brozen and Devine. (Tr. 147–148, 156–157). All this evidence was obtained before the government acquired the Work Papers; and it was this evidence alone that led Mr. Maffeo to answer "ready for trial" in March 1988. (Tr. 156–157). Accordingly, I conclude that the government has provided more than ample proof that its evidence against Schwimmer was secured from legitimate independent sources.

### C. *Absence of Testimony from Agent Marvin Friedman*

■ When agent Brozen retrieved the Work Papers from Mr. Glickman's office he was accompanied by agent Marvin Friedman. Agent Friedman did not testify at the remand hearing. Schwimmer contends that the absence of testimony from agent Friedman "precludes an affirmative finding that the government met its heavy burden of proof." (Def.Mem. at 40). This contention proves too much.

To satisfy its burden of proof under *Kastigar*, the government need not provide testimony from every person in any way associated with the Schwimmer investigation. *United States v. Romano*, 583 F.2d 1, 8 (1st Cir.1978); *see Bianco*, 534 F.2d at 509–10. On the other hand, the government may not rely on mere conclusory denials. *See United States v. Nemes*, 555 F.2d 51, 54–55 (2d Cir.1977).

In this regard, I am persuaded by the reasoning of the First Circuit in *United States v. Romano:*

> [m]uch obviously depends on all the facts and circumstances of a particular case. Here we think it was not necessary, nor would it have been particularly meaningful to require that every individual in any manner affiliated with the investigation provide an affidavit denying contact with the testimony.
>
> Affidavits from principal investigators were provided and there was much additional evidence—and nothing to the contrary—establishing lack of taint. 583 F.2d at 8.

As in *Romano*, I conclude that it was not necessary for the government to provide testimony from agent Friedman to establish non-use of the Work Papers.

The principal agents involved in the financial investigation, agents Brozen and Devine, testified that they did not use the Work Papers in any way. Mr. Maffeo testified that he did not use the Work Papers or recall any discussion of the Work Papers with agent Friedman. (Tr. 139, 157). My conclusion that the government's case was derived from legitimate independent sources of proof is not affected by gossamer speculation concerning possible use of the Work Papers by agent Marvin Friedman.

### D. *New Information Contained in the Glickman Work Papers*

■ Finally, Schwimmer makes much of the fact that the Work Papers contained some figures different from those contained in the government's spreadsheets.

(Def.Mem. at 23–38).[3] Schwimmer also contends that alterations appearing in the government spreadsheets establish that the government "used" the Work Papers (*Id.*).

I have laboriously scrutinized the government spreadsheets, the Work Papers and the items discussed in Schwimmer's post-hearing submissions. Schwimmer's contention that the Work Papers contain figures different from those in the government spreadsheets is correct. The government does not, however, claim that all the figures are identical.[4] (Tr. 90).

Of the hundreds of entries in the government spreadsheets, Schwimmer focuses on a relatively few figures that differ from figures in the Work Papers. According to Schwimmer, these differences establish that the government obtained "additional information" from the Work Papers. (Def. Mem. at 24). I disagree.

After examining the Work Papers, agent Brozen concluded that they contained "nothing we didn't know already ..." Despite the difference of some figures, agent Brozen obviously concluded that the *substance* of the Work Papers was the same as the information reflected in the government spreadsheets. Agent Brozen did not report to Mr. Maffeo that the Work Papers contained information he "hadn't seen in precisely that form ..." (Tr. 114). Because Mr. Maffeo believed that the Work Papers contained no new information, he did not adjust preparation of Schwimmer's prosecution after the Work Papers were obtained. (Tr. 157). Therefore, I am satisfied that the Work Papers did not provide new substantive information that was used by the government.

I have also examined the alterations of the government spreadsheets referred to by Schwimmer. Most of these alterations serve only to reduce income allocated to Renda. It is not surprising that Renda's allocations are reduced, as agents Brozen and Devine testified that Glickman negotiated for such reductions. Reductions in the income allocated to Mr. Renda do not, however, indicate that the government "used" the Work Papers.

Two $500,000 transactions conducted with the Republic National Bank were initially charged to Renda and subsequently allocated to Schwimmer. (Tr. 88). This re-allocation was made as a result of Joseph DeCarlo's cooperation. (Tr. 50, 51, 111).

Of the hundreds of items allocated to Schwimmer in the government spreadsheets, only one other item was ever charged to Mario Renda. (Gov.Exh. F4–B, check No. 522). It is beyond question that Schwimmer's fate was sealed whether or not this single item was charged to Schwimmer. Moreover, as discussed above, the testimony indicates that not even this item was charged to Schwimmer through use of the Work Papers.

Thus, a thorough review of the government spreadsheets, the Work Papers and the arguments of Schwimmer's counsel does not affect my conclusion that the government did not use the Work Papers.

3. Schwimmer maintains that the different figures in the Work Papers were "new information." (Def.Mem. at 14–15). According to Schwimmer, the mere fact that the Government obtained such information "is dispositive on this hearing since the prosecutor failed to establish procedures (*i.e.* "Chinese Walls") to prevent use of this information ..." (Def.Mem. at 14–15). This argument overstates the law in this Circuit and is without merit. The case cited by defendant, *United States v. Schwimmer,* 882 F.2d 22, 26 (2d Cir.1989), is an earlier proceeding in this very case. In *Schwimmer,* the Second Circuit stated that, if there is a *retrial,* "without deciding the issue, it would appear prudent for the government to establish a so-called 'Chinese Wall' ..." *Id.* Because there has been no retrial, *Schwimmer* obviously does not yet require erection of Chinese Walls in this case. It is also noteworthy that even in the event of a retrial, the Second Circuit recommended, rather than required, that the prosecution take steps to separate its prosecutors from persons exposed to tainted evidence. *Id.* For the above reasons, I reject Schwimmer's "Chinese Wall" argument.

4. Apparently, before the Second Circuit the government claimed that it possessed "everything" that was in the Work Papers. (Tr. 95–97). The government abandoned this claim at the remand hearing by admitting that the Work Papers contained some figures different from the government spreadsheets.

## IV. TESTIMONY OF MR. MAFFEO

 Lastly, Schwimmer contends that this Court improperly called Mr. Maffeo as a witness after the parties rested. (Tr. 19). This is an untimely, last-ditch technical argument that smells of the lamp.

First of all, Schwimmer's contention that the parties rested before Mr. Maffeo was called is not supported by the record. Throughout the remand hearing Schwimmer's own counsel suggested that he might call Mr. Maffeo as a witness. (Tr. 75, 81). After Assistant United States Attorney Alan Friedman indicated that he would not call Mr. Maffeo as a witness, he rested. (Tr. 118–123). At this juncture, the Court indicated that it might find testimony from Mr. Maffeo helpful. (Tr. 125). With unseemly haste, counsel for Schwimmer then rested immediately. (Tr. 126).

Clearly, this Court has the authority to call witnesses to supplement the record. Fed.R.Evid. 614. That a trial court lacks this power "never will be conceded so long as the bench retains a true conception of its constitutional function and a due sense of self-respect." 9 Wigmore, Evidence § 2484 at 282. (Chadbourn rev. 1981). I reject the notion that counsel can enervate this Court's ancient power to call a witness by interjecting his intention to rest after the Court has expressed its interest in a witnesses' testimony. The argument, though perhaps ingenious, is not ingenuous.

Further, Schwimmer's objection, if that is what it was, was certainly not calculated to apprise the Court of his concern. After Mr. Maffeo took the stand, Schwimmer's counsel stated that:

> I thought your Honor was calling [Mr. Maffeo] as your witness, as opposed to Mr. Friedman calling him. If your Honor prefers it that way, *that's okay.* I want to put on the record I'm confused as to how this is proceeding. (Tr. 131) (emphasis added).

Schwimmer's counsel did not object to Mr. Maffeo's testimony at any point during the hearing.

Fed.R.Evid. 614(c) provides that "[o]bjections to the calling of witnesses by the court ... may be made at the time ..."

This rule is intended to ensure that objections are timely made, thereby enabling the Court to take any necessary corrective measures. 3 *Weinstein's Evidence,* ¶ 614[04]; *see* Fed.R.Evid. 614 advisory committee's note. Clearly, counsel cannot remain silent during a hearing, effectively waiting in ambush, and only afterwards spring its objections on this Court. Because Schwimmer did not object to Mr. Maffeo's testimony during the remand hearing, I reject Schwimmer's belated objections as untimely.

## CONCLUSION

For the reasons discussed above, I conclude that the government has met its burden of proving that its case was derived from legitimate independent sources of proof rather than from the direct or indirect use of privileged information. I also conclude that Mr. Maffeo properly testified at the remand hearing.

SO ORDERED.